J. E. Coleman, in error, v. The State of Florida—Opinion of Court.

---

JAMES E. COLEMAN, PLAINTIFF IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

1. It is not error to refuse to give instructions to the jury which had already been substantially given.

2. Where the evidence is circumstantial, but of such a character as to preclude every hypothesis inconsistent with the guilt of the accused, the verdict will not be set aside as being against the evidence.

Writ of error to the Circuit Court for Polk County.

The facts of the case are stated in the opinion.

*Eppes Tucker and C. C. Wilson*, for Plaintiff in error.

The Attorney General, for Defendant in error.

MITCHELL, J.: The plaintiff in error was convicted at the

fall term of the Circuit Court, Polk County, of the murder of Miles Burley, by shooting, and recommended to the mercy of the Court by the jury.

Motion for new trial was made upon the grounds: 1. That the verdict was contrary to law. 2. That the verdict was contrary to the evidence: and 3. That the verdict was contrary to the charge of the Court. The motion was overruled, and the defendant sentenced to the penetentiary for life, and the case comes before this Court upon writ of error to the Circuit Court of Polk County, and the following errors are assigned: The Court below erred in refusing to give the first, second, third and fourth charges requested by the defendant. That the Court erred in overruling defendant's motion to set aside the verdict and a new trial grant. The Court erred in rendering judgment and sentence against the defendant.

Counsel for defendant requested the Court to charge: 1. " The party accused is entitled to the legal presumption in favor of innocence, and the guilt of the accused must be fully proved. No weight of preponderant evidence is sufficient for the purpose unless it excludes all reasonable doubt."

2. " The statement of the defendant is entitled to full weight."

3. " In order to warrant a conviction of crime on circumstantial evidence, each fact necessary to the conviction sought to be established, must be proved by competent evidence beyond a reasonable doubt."

4. "The commission of an offense implies the presence of the defendant at the necessary time and place; therefore, evidence in negation of such presence is always competent, nor does the failure to prove it, when attempted, render necessary full proof of the crime on the other side. A

perfect alibi must cover the whole time when the presence of the prisoner was required. Yet the testimony as produced shall go to the jury to be considered for what it is worth."

These several instructions were refused upon the ground that they were severally substantially given to the jury in the general charge, except the second instruction, which was marked "refused," without giving any reason for such refusal.

Where charges requested had already been substantially given by the trial judge, it was not error for the judge to refuse to repeat the charges. Dixon vs. State, 15 Fla., 636; Sherman vs. State, 17 Ib., 888; Carter vs. State, 22 Ib., 553. We have carefully considered the judge's charge in connection with the charges requested by the defendant, and find that the judge had, when the defendant presented his instructions, already charged the jury upon the points sought to be raised by defendant's instructions, and that the judge's said charge, in this respect, was substantially correct, and that it was fair to the accused, and that there was no error in the Court refusing to give the instructions presented by the accused.

The charge in regard to the defendant's statement is as follows : "Under the law the defendant is entitled to make a statement, under oath, in his own defence, and the jury can give it just such weight as they deem proper under the state of other facts proven." This charge is substantially correct,

The charge requested by the defendant upon this subject was so vague and indefinite that it was calculated to mislead and confuse the jury, and hence it was properly refused.

The charge requested by the defendant in regard to his statement to the jury was so vague and indefinite that it

was calculated to mislead and confuse them, and therefore it was properly refused. The judge had, at the time the defendant requested this charge, already charged substantially the law applicable to the statement of the defendant, and he was not required to repeat his charge, even if the charge requested by the defendant was correct.

The only remaining question to be considered is, does the evidence in the case sustain the finding of the jury? Burley was shot and killed at the house of one Mose Allen, near Homeland, Polk County, about five miles from Fort Meade, on the night of the 22d of September, 1888. On that night a festival was being held at Allen's house, and the evidence tends to show that the killing occurred some time between 9 and 11 o'clock, and that when shot Burley was on the verandah on the north side of the house, and that the shot which caused his death was fired from about where a small orange tree stood in a cane patch to the east and about twenty-five or thirty feet from where Burley was shot; and McLeod, a witness for the State, says that Burley was killed, as he thinks, by a rifle ball. (Another witness states that his brains were shot out.) McLeod also states that just before the shot was fired, he saw some person in the cane patch, near where the shot was fired, slipping along about half-bent, with a gun or a cane in his hands, and that the person he saw had on dark clothes and white hat; that he took it to be a straw hat; that there were some thirty or forty people at the festival at Allen's house that night. Witness also states that he saw Nelson Tillis at Allen's that night; that shortly after Tillis came up, witness asked him who came with him, and that he said no one; that he asked where Coleman was, and Tillis said that he left him at home sick. That Tillis arrived at Allen's about 9 o'clock, and that witness saw the man slipping along in the cane

patch with a gun or cane shortly after Tillis arrived at Allen's. That he saw the man in the cane patch twice, the second time was some ten or fifteen minutes after seeing him first. That Allen lived about five miles from Fort Meade; that witness did not see Coleman on the night of the killing; that he did not mean to say that it was not Coleman that he saw in the cane patch; that he did not know who it was he saw there.

Pink Burley states that she knew Coleman; that Burley was her husband; that they had been married but a week when he was killed; that she last saw Coleman on Saturday night before she was married on Sunday, and that she told Coleman at the time that she was going to be married, and that he said: "You going to be married, who are you going to marry?" That she said Miles Burley, and that Coleman then said: "If you marry him I will take my rifle and blow his brains out," and that witness and Coleman both laughed. That Coleman had not been making love to witness, and that he did not seem to be mad at the time and said nothing against Burley.

Nelson Tillis, a witness for the State, says that he knew Coleman, and that he saw him on the night Burley was shot, in Fort Meade, walking along rather north and west. Mose Allen lives rather north from Fort Meade, and that he and Coleman left Fort Meade somewhere about 8 o'clock together, going to the festival at Allen's, and that Coleman had a gun with him which he carried to within a mile of Allen's, but he did not see the gun after that. That he and Coleman went to within fifty or a hundred yards of Allen's when Coleman stopped and witness went on to the festival, and left Coleman standing in the road; that afterwards he saw Coleman sitting on a log not far from where he had left him, east of Allen's house; that when witness

went back to Coleman he, witness, was eating something that he had bought at the festival, and that he gave Coleman some of it, gave him some chicken which had bone in it; that Coleman asked him when he went back to the house to see who all were there, and asked if Burley was there; that he told Coleman that he had not seen Burley, but had seen his wife, and that Coleman said he guessed Burley would be there. That Coleman gave as a reason for not going up to Allen's house that he had on his dirty clothes, and that Tillis need not tell any one that he was there. That there was a cane patch on the east side of Allen's house, and that Coleman was about twenty or thirty steps from it when witness gave him the chicken. On cross-examination, this witness acknowledged that he had been under arrest for killing Burley, and that he was induced to make the statement against Coleman by friends who told him that it was the best for him; that he was in irons at the time, but that he only stated what he knew about the case.

Another witness testified to seeing Tillis and Coleman going toward Allen's house on the night of the killing, not far from the house.

Louis Honors, a witness for the State, says that he knew Coleman and Burley; that he saw Coleman on the night of the killing, about 9 o'clock, a half or three-quarters of an hour before Burley was shot; that Coleman was at the time sitting on a log on the "sun-rise" side of Allen's house, on the cane patch, and that Nelson Tillis was going there; that Coleman was somewhere from fifty to one hundred yards of Allen's house, and that witness was about twenty-five or thirty yards from Coleman and Tillis at the time. That he heard Coleman ask Tillis "if he had come," and that Tillis said "yes, Miles is come." That Tillis was eat-

ing something at the time and gave Coleman some, and that directly he heard Coleman say that he would "get the gentleman;" that they talked on for some time, and Nelson said he seemed friendly and everything, and that he would not bother him that night, but that if Coleman would, to be very careful and not hurt anybody else; that this occurred about a half or three-quarters of an hour before Burley was shot; that witness was in the cane patch at the time he heard this conversation.

Isaac Ellerson, for the State, testified that he knew Coleman, and that he knew Burley; that he heard of the killing of Burley, remembers the night; that he saw Coleman on that night; that he was living in the house with Coleman; that he saw Coleman that night, he guessed as near as he could make out, not having any time-piece, it was about half past eleven or twelve o'clock, or something like that; it was at his house; that he owned a rifle at that time, but did not know the name of it; that the gun was at Coleman's that day; that he left it there in the morning; that the gun was somewhat rusty and needed cleaning up, that he oiled it and left it there, saying that he would clean it when he returned from his work; that when he returned from his work he went to look for the gun and it was gone; supposed it was about 8 o'clock, and that no one was with him when the first search was made; that he looked in both rooms for it; that he made a thorough search, and that the gun was not there; that he saw the gun that night soon after Coleman came back, about three minutes he reckoned; that when Coleman came, witness called him and asked him if it was Coleman, and he said yes, and that he then asked Coleman where his gun was, and that he said: I will tell you directly; "he came in and asked for a lamp and says: It is half-past ten; I says I didn't ask the time; I says where's

my gun; he says it is here; I says no it aint, because I have looked in both rooms and can't find it. I cleaned it up for you," he says, "and it's here." That when Coleman told him the gun was there, he went in the room and it was there, and that he had hunted the gun in that room ; that he had examined the gun and it was loaded when he left it in the morning, it had four cartridges in it; that he did not examine the gun after Coleman returned until after he heard of the shooting; that he heard of the shooting early in the morning, and that Nelson Tillis told him of it; that as near as he could tell, he examined the gun about 7 o'clock; that he found that the gun had been shot once, one of the cartridges was gone; there were three cartridges in the gun that morning, and four the morning before; that he thoroughly examined the barrel and muzzle of the gun and that it looked like it had been recently shot ; that when a gun has not been shot for some time it looks white, kind of ashy in the barrel; this gun looked dark in the muzzle, just as if it had been shot recently; that he saw Coleman when he came in that night, he had on a dark shirt, striped, some stripes in it, and jeans pants and straw hat; that when Coleman came in the room where witness and Juniors were, Juniors said to him : "Coleman, what in the world is the matter with you ?" That Coleman said he was sick. Juniors said "you look mighty bad," and Coleman said "yes," that he was feeling mighty bad, and witness asked him where he had been and Coleman said he had been sick, and that he came by Mr. Scott's and laid down on the piazza and fell to sleep ; that Coleman looked as though he had been sick for a long time, and as if he had run for a distance; he was all sweaty and looked very warm ; he looked bad and was sweating ; that Coleman pulled off his clothes, and that he saw them after they were pulled off,

and they were wet and sandy about the legs; that he heard of the shooting of Burley in the morning; that Nelson Tillis told him of it; that Coleman asked Tillis what kind of a time they had at the festival, and that he said a nice time, only that a man got shot; that he asked Tillis who got shot, and he said Burley, and that he said that he, Tillis, talked as if it was somebody that no one knew; that Juniors asked if his wife seemed to take on much, and that Tillis said right smart, that it seemed that no one paid much attention to her, and that Coleman said that no one ought to care for her after she said she was not going to marry Burley, and then to go and marry him. On cross-examination, the witness stated that he did not see the gun on the day he oiled it, after oiling it; that he did not know who had had his gun that day, as he was not there; that he remembered that he used the gun six or seven days before the time he had testified about; that he had shot the gun once, about a week before; that he did not often use the gun; that he carried four cartridges in the gun, shot a rabbit, and that left only three; that he ate his supper about 10 o'clock that night, and then read; that he and Coleman had some trouble about some shoes, but it did not amount to anything; that he put on a pair of Coleman's old shoes and wore them, and in about two or three weeks Coleman said the shoes were his, and charged me seventy-five cents for them; that he and Coleman had had some words about some clothes that witness' friend Kean had left in his charge; that Coleman claimed that Kean gave them to him, and that witness told him that he nor nobody else would get them without the authority of the law; that he had no malice towards Coleman; that Coleman said nothing to him about leaving town that he knew of. On re-direct examination, the witness stated that after he shot the rabbit he

put another cartridge in the gun; that he left four in it; that about the first of June he attended prayer-meeting at Fort Meade, at Hall's, a colored gentleman in town, and that after the meeting was over he returned to his house and went to bed; that he left some rags burning, the mosquitoes were bad, and that he dropped off to sleep, and some one came and hailed; that he had only been to sleep a few minutes; that some one said: Who lives here? that he replied: Isaac Ellerson, and then the party said: Come out here, that he wanted to trade with him; that he said he would not go out unless he knew who it was, and that then the party shot at him; that the party saw him across the room by the window and ranged his bullet just ahead of him; that he did not know where Coleman was at that time.

The evidence of Ellerson is corroberated by that of Jake Juniors, a witness for the State, in almost every particular.

The defendant attempted to prove an *alibi*, but in this he failed completely. His whereabouts during the time in which he could have committed the crime with which he was charged was wholly unaccounted for, except by his own statement. In his statement to the jury he denied being at Allen's on the night Burley was killed, but said he was at Fort Meade sick, but the evidence is, we think, conclusive that he was at Allen's place on the night of the homicide, and his denial, under the circumstances, certainly is against him.

There are other circumstances—minor circumstances—shown by the evidence, but the foregoing is the substance of the evidence, and it is, in our opinion, sufficient to sustain the finding of the jury. The evidence is not conclusive as to the defendant's guilt, but the circumstances are so strong—they point so directly to the defend-

JANUARY TERM, 1890.          71

ant as the perpetrator of the cowardly assassination—as to preclude every reasonable hypothesis inconsistent with his guilt, and hence we can see no reason for setting aside the verdict as being against the evidence.

It may be difficult to find from the evidence a sufficient motive for the perpetration of so base a crime, but we think that the motive may be found to be that of jealousy and revenge, because Burley married the woman he did marry. This was motive sufficient in so depraved a character as the defendant is shown to be, and we have no doubt but that this was the conclusion arrived at by the jury in their enquiry as to what motive prompted the defendant to commit the crime.

We have most carefully considered the whole case, and, after doing so, can find no sufficient reason for reversal, and, therefore, the judgment of the court below is affirmed.