ELIAS J. KENNEDY, PLAINTIFF IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

LARCENY—ALLEGATION AND PROOF OF OWNERSHIP—OWNERSHIP BY HUSBAND AND WIFE—CIRCUMSTANTIAL EVIDENCE—INDICTMENT.

1. Under the provisions of Section 2893 of the Revised Statutes, an indictment containing two counts, both charging the larceny of the same goods at the same time and place, but laying the ownership thereof in different individuals, is not bad for duplicity.

2. Where the legal owner of goods delivers them to another as bailee for safe-keeping, and the same are stolen from the possession of

Elias J. Kennedy v. The State of Florida.—Syllabus.

such bailee, the indictment charging the larceny thereof may lay the ownership either in the legal owner or in the bailee ; or, in separate counts, may lay the ownership in both the legal owner and the bailee, at the option of the pleader.

3. The ownership of goods stolen must be proved as alleged in the indictment charging the larceny thereof; but, where the indictment lays the ownership in E. and W., and the proof shows that the stolen goods belonged legally to K., but that when stolen they were in the possession of E. and W. for safe-keeping, such proof is sufficient to sustain the allegation of ownership in E. and W.

4. Where K., who is the legal owner of the property, leaves it for safe-keeping in the immediate possession of E., who is the wife of W., and E. and W. live together as man and wife in the same house, and such property is stolen from the possession and custody that E. and W. have over the same, consequent upon their relationship as husband and wife, an indictment charging its larceny may properly lay the ownership thereof either in the legal owner, or in W., the husband, or in E., the wife, or in E. and W. jointly ; or may lay the ownership to be in all of them ; and if the proofs sustain such status and relationship of the parties as between themselves and towards the property stolen, it will be sufficient to establish the ownership as laid.

5. Where circumstantial evidence is relied upon for conviction, it is necessary that the circumstances shall all concur to show that the prisoner committed the crime, and that they are all inconsistent with any other rational conclusion than that of his guilt.

Writ of error to the Circuit Court for Walton county.

The facts in the case are stated in the opinion of the court.

*C. J. Perrinot and Daniel Campbell* for Plaintiff in Error.

*The Attorney-General* for Defendant in Error.

TAYLOR, J. :

The plaintiff in error was indicted, tried and con-victed in the Circuit Court of Walton county for lar-ceny, and brings such judgment of conviction here for review by writ of error.

The indictment upon which the trial was had con-sists of two counts, the first alleging the larceny to have been of $2,500, consisting of gold coin of various denominations and sundry current treasury notes of the United States, and bank bills of different national banks, and sundry current certificates of gold and sil-ver deposits in the treasury of the United States, *of the goods, chattels and moneys of William Kennedy and his wife, Emma Kennedy.* The second count charges the larceny of the same property, but lays the ownership thereof in one John W. Kennedy.

The defendant moved the court to quash this indict-ment upon various grounds, none of which are urged here except the one contending that said indictment is void for duplicity, in that by its first count it alleges the ownership of the property to be in William and Emma Kennedy, and by its second count lays such ownership in John W. Kennedy. This motion was denied, and this ruling is assigned as the first error.

There was no error here. Section 2893, Revised Stat-utes, expressly provides: "No indictment shall be

quashed or judgment be arrested or new trial granted on account of any defect in the form of the indictment, or of misjoinder of offenses, or for any cause whatsoever, unless the court shall be of the opinion that the indictment is so vague, indistinct and indefinite as to mislead the accused and embarrass him in the preparation of his defense, or expose him after conviction or acquittal to substantial danger of a new prosecution for the same offense." This provision of law was in force at the time of and long prior to the adoption of the Revised Statutes, being incorporated therein from Chapter 1107, laws of 1861. And this court in Green vs. State, 17 Fla., 669, says of it, in passing upon a similar objection, that it was evidently adopted with particular reference to the question which is raised in this case. We can not see wherein the indictment under discussion was at all calculated to mislead or embarrass the defendant in the preparation of his defense, nor wherein there could have been any substantial danger of an exposure to another or new prosecution for the same offense in the event of an acquittal or conviction thereunder.

In Owen vs. State, 6 Humph. (Tenn.), 329, it was held that the property in a horse, that was the subject of the larceny, was well laid in different counts of the indictment in both its real owner, and in the person who had the temporary possession thereof.

The second assignment of error was the refusal of the court at the trial to permit a witness, John W. Kennedy, to be questioned as to whether he did not

tell one B. S. Liddon at Westville in February, 1891, that he did not have a cent of money. The evidence in the case developed the fact that in August, 1891, this witness deposited with Emma Kennedy for safe-keeping the $2,500 alleged to have been the subject of the larceny. The evident purpose of the question that he was not permitted to answer was to lay the ground-work for impeaching him as to the possession by him of so much money in August, 1891. For this purpose the time fixed in the refused question was too remote to be at all relevant, for the obvious reason that though a man may not have a cent in February, it is no reason or proof that he could not have a large amount of cash by the following August.

The third assignment of error is the refusal of the court to permit a witness, John Neel, to testify that when he paid over to J. W. Kennedy in July, 1891, $1,000 of the money alleged to have been subsequently stolen, that J. W. Kennedy then passed it over to the defendant, saying that it was the defendant's money. The objection made and sustained to the admission of this testimony was because of its irrelevancy. We, like the court below, fail to see its relevancy to any issue in the cause, and no effort seems to have been made to point out or suggest its relevancy. There was, therefore, no error in its admission.

The fourth and fifth assignments of error will be considered together, and are as follows: 4th. The court erred in refusing the following charge asked by defendant's counsel: " If from the evidence you find

that the property was in possession of Emma Kenne-
dy as an agent or special custodian of the owner, J.
W. Kennedy, even though this possession be with the
knowledge and consent of her husband, William Ken-
nedy, then the evidence does not sustain the allega-
tion as to the possession and ownership of William
and Emma Kennedy, and the defendant should be ac-
quitted." 5th. The court erred in charging the jury :
" The question of the legal ownership was not for their
determination, and that they were not required, for the
purposes of this case, to inquire further than to ascer-
tain the possession of the property." The only object
in alleging in an indictment for larceny any particular
ownership in the property stolen is to subserve the
purpose of a part of the *description* of the stolen
property and to assist in its identification. 2 Bishop's
Crim. Pro., sec. 718. Technical niceties as to the legal
ownership or title to the stolen property are never
properly at issue in such cases. The general rule be-
ing, that where chattels are taken feloniously from
any bailee or other person having in them a special
ownership, from one, *e. g.*, who has it for safe-keep-
ing otherwise than as servant, the ownership may be
laid in the indictment either in such possessor or the real
owner at the election of the pleader. 2 Bishop's Crim.
Pro., section 721 ; Owen vs. State, *supra* ; Palmer vs.
People, 10 Wend., 166 ; Barnes vs. People, 18 Ill., 52.
When the proof is gone into, while it must sustain the
allegation in the indictment as to the ownership laid
therein, yet, as to the ownership, it is sufficient if it

shows that the person alleged as owner had the pos-
session thereof as bailee or custodian for safe-keeping
at the time of the felonious taking. 2 Greenleaf on
Evidence, section 161 ; State vs. Somerville, 21 Maine,
14, and authorities there cited.

At the common law, because of the wife's inability
to own any property in *possession*, in larceny of the
wife's goods the ownership had to be laid always in
the husband, but this rule has been changed in the
American states that have adopted laws giving to the
wife a separate proprietorship over all classes of prop-
erty *at law*. By our Constitution and laws a married
woman has the right to own, in her own separate right,
all kinds of property, real and personal. By Section
2071, Rev. Stat. (enacted long prior to the Revised
Statutes), all the properties of the wife are given into
the care and management of the husband. In conse-
quence of this, where the wife's property has become
the subject of larceny, the ownership thereof in an in-
dictment for such larceny can be properly laid in
either the husband or the wife, where they live to-
gether—in *her* because of her *legal* ownership, and in
*him* because of his special ownership as custodian.
Petre vs. State, 35 N. J. (Law), 64 ; State vs. Win-
craft, 76 N. C., 38 ; State vs. Matthews, *Ibid*, 41 ;
Lavender vs. State, 60 Ala., 60 ; 2 Bishop's Crim. Pro.,
sec. 726. In the case under consideration the subject
of the larceny was given, from the proofs, by its legal
owner into the immediate custody of Emma Kennedy,

the wife of William Kennedy, for safe-keeping, there-by investing her with such a *special* property therein as would have sustained the laying of the ownership *in her* in an indictment for its larceny. Suppose, in-stead of being left with her for safe-keeping, it had been given to her absolutely to be her own property, ·certainly under our statute giving to her husband the care and custody of same, in the latter case, he would have acquired such a special ownership therein as would have warranted the laying of the ownership *in him*. Under this state of the law touching the owner-ship and immediate care, custody and possession of property as between man and wife, where they live together, it would be a refinement too microscopic in character to further the ends of justice to say, that property owned by her *absolutely* can properly be al-leged to be *his*, but that property in which she held only a *special* ownership by possession for safe-keep-ing can be said to be *hers* only. We think that under ·our laws the ownership of the property stolen in this case could, with propriety, have been laid in this in-dictment either in J. W. Kennedy, the real owner, or in Emma Kennedy, with whom it was immediately de-posited for safe-keeping, or in William Kennedy, the husband of Emma; or it might have been properly alleged as the property of *all* of them; or, as was done in the first count in the indictment, it could prop-erly have been laid in William and Emma Kennedy jointly, they being husband and wife, living together,

and the property being stolen from their joint custody and possession.    From what has been said it becomes apparent that there was no error in refusing the instruction asked for by the defendant, nor in giving the one given and excepted to.

This brings us to the sixth and last assignment of error—the overruling of defendant's motion for a new trial—which involves the sufficiency of the evidence to sustain the conviction had herein.    The testimony adduced in the cause was substantially as follows: Emma Kennedy, for the State, swore that she knew the prisoner. That he was called "Jim," and that he signed his name E. J. Kennedy.    That on the 8th of August, 1891, John W. Kennedy left $2,500 with her to take care of for him.    About $1,700 of it was in gold pieces of the denominations of $20, $10 and $5; most of it being in $20 pieces.    The rest of the money left was paper money, such as was then current and in common use.    From this deposit John W. Kennedy subsequently came and got $250 in paper money, saying he wanted it for Jim Kennedy, the defendant. I put the money in my trunk in my room, and it was there from the 8th of August to the 15th of September, 1891.    On the latter date I left my house with my husband, William Kennedy, between one and two o'clock p. m., to go to the field.    The money was there when I left.    I came back about sundown of the same day and the money was not there.    The axe was not in the place where it was kept, but was sitting

near in the door, and I knew something was wrong.
I saw the axe before I got to the gate.  My trunk was
broken open and the money gone.  Jim Kennedy,
the defendant, came to the field about three o'clock
in the evening.  He was by himself in a road cart
driving a mule.  I think it was Adam's mule; sort of
a black mule, and a two-wheeled cart.  He came to
the field where we were at work from the direction of
the house.  He said he had come from Westville, but
that it had taken him all day to get there.  He talked
about the country being filled with robbers, and said
he would not be surprised if they came that way
robbing, on their way to Freeport.  The biggest part
of his conversation that afternoon was about robbers
and robberies.  When we left the field, Jim (defend-
ant) went to the house with John Q. Kennedy and
me.  My husband, William Kennedy, was behind a
little.  He had gone to feed the hogs.  Defendant said
he expected Uncle John (meaning John W. Kennedy)
to lose his money, and that he was uneasy about it
all the time.  When I went into the house discovered
my trunk was broken open, I called out, and Jim was
the first person to come in.  He seemed very sorry,
and asked me if all was gone.  I replied that they did
not get my watch.  My watch was behind the door
with newspapers over it, and was not in the trunk.
I told Jim it was very strange the money would stay
until he came down, and then my trunk be broken
open.  The defendant staid all night with us (the

night of the day the trunk was broken open), and until next morning. He has never been there since. When J. W. Kennedy gave me the money in my room, Jim was sitting on the door steps with William Kennedy, my husband. J. W. Kennedy had come into the house two or three times before he gave it to me, and Jim would come with him. After awhile my husband asked Jim to go out with him, and they sat down on the door steps, and Uncle John then gave it to me and counted the money. He tried to keep it from rattling, but it rattled some. The day before Uncle John left his money with me, he came down there to a pic-nic with his wife, and had a satchel, and Jim came to me on that day and asked me if Uncle John did not bring his money with him. I told him I did not see it. On the Sunday morning after the Tuesday evening that the money was taken, in searching we found a mule and cart track, and where the mule was tied, and found a hole in the ground about the right size to hold a package of money; it was right fresh. I saw a man's track going in the direction from this hole to the cart. It was about one-half mile or more from the house to where the tracks and hole were. Jim Kennedy left our house about three o'clock in the evening on Wednesday, the next day after the money was taken, after my husband had come back from Westville, where he had gone to tell Uncle John about the money being taken. When my husband went he had taken Jim's cart and

one of his own mules. We were satisfied that Jim had the money, and we sent J. Q. Kennedy with him to watch him, and prevent him from taking it off. Albert Kennedy, John Q. Kennedy, her husband, William Kennedy and herself lived in the house the money was taken from. No one was left at home the day the money was taken. The doors were all left open. The hole found was about fifty yards from the road. John W. Kennedy never told her whose money it was. The witness had been married to William Kennedy about six months before the money was left with her. She had of her own $800 or $900 when she married William Kennedy. They were married in Alabama. She had very little of that money of hers left. Since she was married she had received $90 more from Alabama, that was due her there for teaching school. She bought with the money she had when married, from one Powell $300 for mules, and eighty acres of land from one Edge for $500. When Jim came to the field he talked about a robbery at Mobile, and told about having a dream about crossing a muddy river, and said he was sure something bad was going to happen. He said it was very hot, and opened his coat and vest and showed how wet his shirt was. If it had been dipped in a tub it could not have been wetter. He was the warmest man I ever saw. The money I had I kept it secured. I knew nobody but my husband, and trusted nobody.

John W. Kennedy testified for the State as follows : I carried the money, $2,500, in August down to Wil-

liam Kennedy's. It was mixed, gold and paper; at least $700 in paper money, and the balance in gold. It was the usual currency money. I claimed the money as mine. I left the money with Mrs. William Kennedy the day after the picnic. No one was present but Mrs. Kennedy herself. William Kennedy and the defendant, Jim, had left the room a few minutes before, and I can't say where Jim was when I gave the money to her. The defendant came back to Westville the same day that I did after the picnic, but we were in different buggies. I was in bed at my house in Westville when I got the news of my money being gone. William Kennedy woke me up and told me. No one was with William at the time. I saw Jim Kennedy the next evening; J. Q. Kennedy was with him. They came in a road-cart, driving Adam's mule. Jim was in the habit of stopping at my house when in Westville; had stopped there off and on for the last eighteen months. He was at my house the morning of the same day that the money was reported taken. When he came back from William Kennedy's he stayed the balance of the night at my house, and until next day when an accommodation train came ; he told me that he had an engagement in Pensacola, and was bound to keep it that day. It was several days after I learned of the money being gone before I went down to see if I could trace it. When I went down there I saw where a cart and mule track had gone down the branch about 150 yards. The mule track went down into the branch. I saw foot tracks around the cart track that looked very much like Jim's track. I had

noticed before he left Westville that he was wearing a broad-toed shoe, and the tracks looked as if made by such a shoe. I also saw a newly dug hole. I also saw a horse track that led down very near to where the hole was. I measured the horse track. It was peculiar in this, the shoes came very near together at the heel. The fore feet of the horse were shod, but not the hind feet. Albert and William Kennedy were with me when I measured the horse's track. I traced the horse's track to Argyle, and from there I went to Mr. Cockcroft's, the keeper of the livery stable at De-Funiak Springs, and on his informing me that he had lately hired a horse to Jim I had the horse that he had so hired him brought out, and I measured his track in Mr. Cockcroft's presence and it corresponded exactly with the measurement I had of the other track. The soil was very sandy where the tracks were found and where I measured the horse tracks. I could not see any tracks about the hole. There was much straw about on the ground; pine straw which had fallen, and to walk there would leave no footprints. I claim the money as mine. I got about $1,000 from John Neel in July, 1891, at Westville. I had the balance before that time. I heard of the money being lost on same night, but did not go down in several days. Dogs were killing sheep.

A. J. Mathis, for the State, testified that he went down to Pensacola to look after Jim Kennedy. He was arrested by the sheriff of Escambia county and turned over to witness until next morning. Kennedy

had arranged through his friends to give up on condition that he was not to be locked up. Witness took charge of him and gave him a good deal of liberty and he left him.

William Kennedy, for the State, testified to the same facts as did his wife, Emma Kennedy; explaining that Albert Kennedy was his father, and John Q. Kennedy was his brother, both of whom, with his mother and his wife, lived in the same house. He said further that J. W. Kennedy told him he wanted to leave his money with witness' wife, but did not want Jim Kennedy to know it, and did not want any one to know it except his own wife and witness and his wife. While Jim and himself were sitting on the door step they heard something rattle like money, and Jim said, I told you Uncle John brought his money; he also asked me if Cousin Emma had any gold. I answered yes, I believe she had a little, and Jim said Uncle John is swapping paper money for it. My place where the money was taken is in Walton county, Florida. We always left our doors open when we went to the field. Jim and J. Q. Kennedy and my wife got to the house before I did. I stayed back at my gin house to feed my hogs. Jim and John were in the road as if looking for something. They came to me and said, your house has been robbed; and Jim said, I told you something was going to happen before long. We went in to look for signs, and my axe was leaning up against the door-facing and my money was gone. After supper I took one of my mules and went to Westville to see Uncle John. I saw no un-

usual tracks about the house; saw only our own.. On the Thursday after the Tuesday that the money was taken, I stopped my hands and searched for the money that day and Friday, but found nothing. On Saturday when I came home to dinner, I found Mr. John Vaughn there with my father. They had been searching, but had found nothing. I went then to my field and got a load of corn, and when I got back father and Vaughn were there again, and said they wanted me to go with them, which I did. We went up the road, and on the south side of the road there was a head of a branch between sixty and seventy-five yards from the road. We went there and they showed me where there was a mule and road cart track going in the direction of my house. We tracked it to where it struck the road, and as well as we could tell, the tracks went right on to my field. The road was the one that leads from Westville to my house, the way that Jim had come. There had been no rain. On Sunday my father, my wife and myself went to where the tracks were, and found a hole in the ground about ten or twelve inches deep, a few steps from where the mule had been tied, judging from the tracks near a lightwood knot; and about fifty steps this side, saw a horse track, of which both fore feet were shod, and saw some one's track going in the direction of the hole. It looked like a man's track, about a No. 8 shoe. Could not make out tracks from the hole to where mule was tied. There was too much pine straw on the ground. J. W. Kennedy came to

my house Sunday evening about dark. The next morning he, my father, and myself, went to where the horse tracks were, and I saw them measuring the tracks, but was not near enough to tell whether the measurement was exact. The tracks could not be traced much further than the road, owing to the great amount of travel on the road. We went on to Argyle, and from there to DeFuniak. I saw Ed. Francis at Argyle that day. We went to Cockcroft's stables at DeFuniak and he showed us a bay horse that he said he had hired to defendant on Thursday. J. W. Kennedy measured his track in presence of Cockcroft and myself. My field contains eighty acres or more. It was cotton picking season when Jim came there. My place is seventeen miles from Westville. I never at any time saw any United States officials about there.

A. S. Kennedy, for the State, testified : It was the 15th day of September last that the money was taken. I, with my family, occupy the east end of the house, and William Kennedy and wife the west end. The day the money was reported taken, I was working at my mill place, one and a half miles this side of the house. I left my house ten minutes before or after one o'clock in the afternoon to go to my work. My wife was at Crestview at my daughter's. Mr. Carlisle and wife and John Q. Kennedy were at the house when I left there for my work. When I returned I found Jim Kennedy and the others there. The door of the room in the east end of the house that I occupied was left open that day. I had money in my

pants pocket that was hanging in the room. The money was not taken from the pants. I did not know my daughter-in-law had J. W. Kennedy's money. I found the mule and cart tracks on Saturday, and the horse track and hole in the ground on Sunday morning following. Nothing special about the horse track, only that he was shod on the fore feet. Mr. Chamberlain was with me when I found the horse track, and Mr. Vaughn was with me when I found the road cart track, and Mr. Carlisle was with me when I found the hole in the ground. The mule and road cart track seemed to be pointed in the direction of my house.

John A. Vaughan, for the State, testified: I saw Jim Kennedy about eleven o'clock in the morning on the road between Ponce de Leon and Mushy Bend with a road cart and mule going in the direction of William Kennedy's. I met him about ten miles from William Kennedy's. The cart and mule track seemed to be going towards William Kennedy's when they turned out. We looked around there to see if there were any signs. Mr. William and Albert Kennedy said the money might be buried about there.

William Vaughan, for the State, testified: I saw Jim Kennedy about half past two o'clock in the evening. It was at the school house at Mushy Bend, near William Kennedy's. Jim seemed to be very warm, while his mule seemed to be cool. I had my hand resting on the mule's shoulder, and remember that it was cool. He asked me if I knew if William Kennedy's folks were at home and I told him I did not know.

John Chamberlain, for the State, testified: I left home between three and four o'clock the evening that the money was reported taken, and at that time I saw where a mule and cart track had come into the road about a half mile above the school house. It was a peculiar place, and I noticed it.

George Anderson, for the State, testified: I saw Jim Kennedy pass my place with road cart and mule about twelve o'clock the day he went down. I live about one and three-fourth miles this side of William Kennedy's. I had come in to dinner. I eat at about twelve o'clock. I had no timepiece.

John Q. Kennedy, for the State, testified: It was fifteen minutes to three o'clock when Jim Kennedy came to the field on the day he came down to our place. My watch lacked five minutes of three. I left there next day with Jim. We left with a road cart and mule in the evening. In the morning we had gone by the place where the cart tracks had come into the road and he showed me some jewelry cuff buttons as we were passing; and as we came back by there he was showing me some money. He showed me fifteen $10 bills and one $20 gold piece.

Mr. Cockcroft, for the State, testified: I keep a livery stable in DeFuniak. I hired a horse and road cart to Jim Kennedy two or three days before I heard the report about the Kennedy money. I think it was on Saturday that I hired them to him. I saw J. W. Kennedy measure the track of the horse at my stable,

which was the horse I let Jim have.   The measure he made of the horse track did not correspond with the measure he had of the horse track, only as to one fore foot, and did not fit that exactly.   There was a difference of perhaps a quarter of an inch.   I noticed that any- way we tried the measurement it would not exactly suit.   The horse I hired to Jim Kennedy was a blazed-face horse.   He hired him one evening and returned him next morning.

Frank P. McLane, for the State, testified:   I saw Jim Kennedy in Argyle with horse and road cart.   I think it was on Thursday.   I saw him that night. I was sitting up with Mr. Williamson, who was sick, and he came there about one o'clock at night.   We were talking and he told me that he had lost some money, and he had been out to try and get on track of it, or find out something about it.   I was at church at Argyle that night, but did not see Jim there.

J. D. Francis, for the State, testified:   I saw Jim Kennedy at Argyle with horse and road cart; it was on Thursday; he was on the main street, and was crossing the railroad as if going south, as we call it, the way the road runs.   I saw him again about one o'clock that night.   I was sitting up with Mr. Wil- liamson, who was sick.   Mr. F. P. McLane was there. I did not hear Jim say anything about having been out to find out about any money.   I saw Jim Kennedy frequently at Argyle.   He would come up there often and visit a young lady there, and go with her to

church on Thursday night. There was church there that night; it was Thursday night.

Daniel McLeod, for the State, testified: I went to New Orleans after Jim Kennedy, in response to a telegram from the chief of police there, saying that Jim would come with me without a requisition. I went there and brought him here. I was given a letter by the chief of police directed to one Smith, which the chief said was to Jim. I handed it to Jim and he took it. I knew that Jim could not read, and I asked him to let me read it, and he said all right, and I read it. Jim said it was from a man named Norman.

The foregoing is the substance of the State's evidence in chief.

The defendant introduced the following evidence: John Neel, for the defendant, said: I heard J. W. Kennedy say in his first statement to me, which was a short while after the report of the robbery, and after he had returned from the place where it was said to have been committed, that the money was a nephew's (William Kennedy's) wife's money. I paid over to J. W. Kennedy in the month of July, 1891, or about that time, at my store in Westville, somewhere between $500 and $1000 for wool. J. W. Kennedy did not say to me to whom the money paid by me to him belonged.

One Ward, for the defendant, testified; I met the witness, William Kennedy, on his way to the court for the preliminary trial of Jim Kennedy, which was held in DeFuniak Springs. We were talking about

different matters, and he told me that he had recently paid $300 for mules, and $500 or $600 for land; and that he had about $800 more which he thought about investing in the bar business.

The defendant, in his own behalf, made the following statement under oath to the jury: I am not guilty of the charge against me. At the time of the picnic at Mushy Bend, when they say the money was left by Uncle John (J. W. Kennedy) with William Kennedy's wife, I had gone down there from Westville. Previous to that time I had lived with Uncle John at Westville, but for some time before that had been running on the railroad, and at that time was doing nothing. I would frequently come up to Westville and see Uncle John, and had a road-cart at his place. Some time afterwards I came up from Pensacola to Westville and took my road-cart and hired a mule and went down to Mushy Bend, my cousin, William Kennedy's place. I was in the habit of going there occasionally to see them, and wanted a little recreation. When I went down there I remember stopping at the school house and talking to William Vaughan, who told me that William Kennedy and his folks were down to his field, and I drove down there and found William Kennedy and his wife and J. Q. Kennedy there. I tied my mule in the shade and we all got to talking. I remember how warm it was, and showed them how I was perspiring. Seeing a pair of mules there that my Uncle John had bought

from a man some time before that had been robbed of his money, I spoke of it, and we got to talking about robberies. When we left the field to go to the house that evening, we went, as has been told by the witnesses, and the trunk was found as has been stated, and Emma Kennedy said it had been broken open. After discovering that the money was gone, William Kennedy said he was going in to report it, and I proffered to go with him, but he declined, saying that he would go alone and wanted no one with him, and he went off and returned next evening. I had loaned him my road-cart, and when he returned I hitched up the mule I was driving to my cart, and J. Q. Kennedy and myself left there and went to my Uncle John's at Westville. On our way up, about seven miles from Westville, there was a house on the way, a Mrs. ———, and John said that there was girls there, and that we could get some rum to drink, and he went over and brought back a bottle of rum and we then drove into Westville. I told Uncle John about the money being gone, but he did not seem to feel much concerned about it, and went out sheep hunting. I had left some money with my uncle to take care of for me, some time before that, about $1,000, less expense and Uncle John's charges, which I had received from Uncle John for wool sold by him to Mr. Neel for me, and about $300 that I had given him to keep for me before that time. When I left Westville coming back to Pensacola I stopped off at DeFuniak Springs, and that even-

ing hired a horse from Cockcroft's stable and drove to Argyle and visited a young lady there and went to the church that night about eight or nine o'clock. That night after leaving the home of the young lady I drove out to the place where John Q. Kennedy had bought the rum, to see if I could get some more. I went there and called, but no one answered. I was afterwards told that she thought I was the sheriff of Walton county trying to catch her for selling against the law. When I got back to Argyle I went over to where McLane and Francis were sitting up with a sick man. We cut a watermelon and were on the gallery eating it, but I did not say to McLane that I had been out looking for traces of the money as he has stated. I did not ask William Vaughan if William Kennedy's folks were at home as he has stated, but he did tell me that they were down to the field. I voluntarily came in and gave up to Mathis at Pensacola. During the night after the sheriff of Escambia county had searched my trunk, Mathis told the sheriff that he would take care of me for the night. When the sheriff had gone, Mathis pulled out two big pistols and said he would not require hand-cuffs, that these things (pistols) were enough. He talked a good deal and we walked down stairs, and Mathis got to drinking and got drunk, and I walked off and left him sitting in a chair. When Mathis had me under arrest, he pulled out a letter, which he said was from Uncle John to me, and as I could not read, I asked him to

read it to me, and he read that Uncle John wanted me to come to Westville and make back to him by bill of sale a bunch of sheep that he had made bill of sale to me, and if I would do that there would be no trouble about the charge brought against me about the money, but if I did not do this, he was going to penitentiary me if he could, and that I would be sure to go. That night after leaving Mathis, I got on my horse that I had in Pensacola, and went to Dafney, Alabama, and from there to Mobile, and from there to New Orleans. I had been in New Orleans several days, and had decided to come back, as I knew I was not guilty, and that with my sheep I could give bond, and also had begun to believe that Uncle John was trying to scare me out of the country to get my sheep. Just at this time the chief of police of the city came to me and asked me if my name was E. J. Kennedy, and I told him it was, and that I was willing to go back to Florida without a requisition, and told him to telegraph to Sheriff McLeod, of Walton county, to that effect, which he did, and when Mr. McLeod came over I returned with him, since which time, with the exception of a short while, I have been in jail. Just after I was put in jail here, Uncle John came there and told me that if I would make to him a bill of sale to the sheep, I would have no trouble, and everything would be all right. I told him that I had not taken the money, and that he could do as he liked, but that I was not going to give him the sheep. This closed the defendant's evidence.

In rebuttal, for the State, J. W. Kennedy said: I did write a letter to Jim and gave it to Jackson Mathis for him if he arrested him, but it did not contain what Jim says. I had borrowed $400 from Emma Kennedy on one occasion, but had returned it to her before this affair.

William Kennedy, in rebuttal, for the State, said: I did meet Ward going to court at DeFuniak, but did not tell him that I had paid $600 for land, but did say that Jim Kennedy had been speaking with me about going into the bar business, and that I had about $800 to invest. The money I had reference to was my wife's money.

The foregoing was all the evidence in the cause, and is altogether circumstantial. The well-settled essentials of the sufficiency of circumstantial evidence for conviction have been thus clearly laid down by Mr. Starkie in his book on Evidence (5th Am. ed., Vol. 1, 442): 1st. *"That the circumstances from which the conclusion is drawn should be fully established."* And under this head he remarks: "The party upon whom the burthen of proof rests is bound to prove every single circumstance which is essential to the conclusion, in the same manner and to the same extent as if the whole issue had rested upon the proof of each individual and essential circumstance." 2d. *"That all the facts should be consistent with the hypothesis."* 3d. *"That the circumstances should be of a conclusive nature and tendency."* And under the latter head the author remarks: "Such evidence is

always insufficient, where assuming all to be proved which the evidence tends to prove, some other hypothesis may still be true ; for it is the actual exclusion of every other hypothesis which invests mere circumstances with the force of proof. Whenever, therefore, the evidence leaves it indifferent which of several hypotheses is true, or merely establishes some finite probability in favor of one hypothesis rather than another, such evidence can not amount to proof, however great the probability may be." 4th. " *That the circumstances should, to a moral certainty, actually exclude every hypothesis but the one proposed to be proved.*" Under the latter the author remarks :: " What circumstances will amount to proof can never be matter of general definition ; the legal test is the sufficiency of the evidence to satisfy the understanding and conscience of the jury. On the one hand, absolute, metaphysical and demonstrative certainty is not essential to proof by circumstances. It is sufficient if they produce moral certainty to the exclusion of every reasonable doubt." The same rule is thus stated in note I, Vol. 1 (8th ed.), Roscoe's Crim. Ev., p. 25 : "In all cases of circumstantial evidence the rule is now established by a great preponderance of authority to be necessary, not only that the circumstances shall all concur to show that the prisoner committed the crime, but that they all are inconsistent with any other rational conclusion."

Under the test of this rule the writer, though admitting that the evidence points *grave suspicion* towards the defendant, can not agree with the majority of the

court in their conclusion that it was sufficient to warrant conviction. In my view of the case there is no connection shown between the cart and mule and horse tracks and hole in the ground, found on the side of the branch half mile away from the house, and the theft of the money. Neither do I think there is any connection shown between the theft and the defendant's hire of the horse from Cockcroft on Thursday following the theft, even were I to admit that the proof showed that he went with that horse to the freshly dug hole in the ground at the branch. Neither do I think that any of his proven movements on Thursday and Thursday night have been shown to have any connection with the theft of the money. I think the proof is wholly deficient for conviction, because there is not a circumstance that shows the defendant to have been any nearer to the house from which the money was stolen than the public road that runs near by, at any time while the money could have been stolen. And I think it deficient because it does, not show that the money might not have been stolen by some one else, even after the defendant had arrived at the field where the occupants of the house were at work. The circumstances, according to my view, all point suspiciously towards the defendant as far as they have been established in proof; but I do not think that they go far enough to "exclude every hypothesis but that of the defendant's guilt." On the other hand, the majority of the court are of the opinion that the verdict found was justified by this evi-

dence from a consideration of the following facts established in the proofs: 1st. The defendant's evident desire to follow up J. W. Kennedy's money, and to find out whether he left it with Emma Kennedy, and his knowledge that it was left with her. 2d. His starting out from Westville the day the money was stolen, for the purpose of going to William Kennedy's house. 3d. His being seen within one and three-fourths miles of William Kennedy's house at twelve o'clock that day, going towards said house, and not arriving at the field where William Kennedy and family were until three hours afterwards, and then coming from the direction of the house with no accounting for his occupation or whereabouts in the meantime. 4th. His going to the field excessively heated, while his mule was cool, and as soon as he gets there making excuses for his belated arrival by asserting that it had taken him all day to come from Westville, distant only seventeen miles. 5th. His evident desire to divert suspicion from himself by talking about robbers and robberies and tramps coming through the country stealing, and his expressed uneasiness about Uncle John's money, and prediction from his dream that something bad was going to happen. 6th. His being the first one to go into the room to Emma Kennedy on her calling out when she discovered the loss of the money. 7th. His diverting J. G. Kennedy's attention from the cart and mule tracks where they came into the road from the hole in the ground near the branch on two occasions, (1) by showing him cuff

buttons, and (2) by showing him the fifteen $10 bills, and the $20 gold ' coin while passing that particular spot. 8th. His possession, next day after the theft, of the $20 gold coin, and the paper money consisting of fifteen $10 bills. 9th. His inquiry at 2:30 o'clock p. m., the day the money was stolen, of William Vanghan at the school house, if William Kennedy's folks were at home, and his subsequent denial in his statement at the trial of having made such inquiry. 10th. His leaving Westville on the train on the Thursday after the Tuesday that the money was stolen, with the assertion that he was going to Pensacola to fill a business engagement, but instead of going there, stopping off at DeFuniak and hiring a horse whose track is discovered near the mysterious hole in the ground near William Kennedy's. His contradicted account of what he did and where he went with that horse. His coming up at Argyle on that night at one o'clock in the night, and then asserting that he had been out trying to get on track of some money he had lost, and his subsequent denial of such assertion. The fact of the cart's divergence from the road and being tracked back into the road, going towards William Kennedy's house; the proof as to the shoe track, the tracing of the horse track from about the hole to Argyle, the fact that defendant went in the direction of William Kennedy's house from Argyle, as shown by his statement that he was at the house where the rum had been obtained ; and his failure to account for the large amount of money exhibited by him to J. Q. Kennedy. 11th. His escape from the sheriff after be-

ing arrested, and flight from the State. The majority of the court are of the opinion that from these leading facts in the case, and from a consideration by the jury of all the circumstances and surroundings of the parties, that we would not be justified in disturbing. the verdict found thereon. This being the conclusion of the court, and no other errors appearing in the record,. the judgment of the court below is affirmed.