J. C. WHETSTON, PLAINTIFF IN ERROR, VS. THE STATE. OF FLORIDA, DEFENDANT IN ERROR.

1. Circumstantial evidence may be relied upon to establish guilt, but the value of this kind of evidence consists in the conclusive nature and tendency of the circumstances relied upon; they must not only be consistent with guilt, but must be inconsistent with innocence. Such evidence is always insufficient

where, assuming all to be proved which the evidence tends to prove, some other hypothesis may still be true. What circumstances will amount to proof can never be matter of general definition; the legal test is their sufficiency to satisfy the understanding and conscience of the jury to the exclusion of every reasonable doubt.

2. Tracks, marks or indications discovered at or near the scene of the crime, tending to connect the accused with them, and pointing to him as the guilty agent, may be shown in evidence to establish the charge against him. Among these indications, footprints found at or near the place where the crime was committed, along with the discovery of the crime, corresponding with the tracks of the accused, may be resorted to for the purpose of identifying him as the guilty party.

3. Where foot-prints found at or near the scene of crime are not distinguished from those of the ordinary character by any peculiar marks, and the correspondence between them and the tracks of the accused is merely in superficial shape, outline and dimensions, it may serve to confirm a conclusion established by independent evidence, but cannot be in itself safely relied on, on account of the general resemblance known to exist among feet and shoes of persons of the same age or size. But where certain peculiarities are observed which at once distinguish the impressions from all others, an exact correspondence, verified by the test of comparison, may have a decisive bearing.

4. The testimony in this case considered and held insufficient to sustain the verdict.

Writ of error to the Circuit Court for Wakulla county.

STATEMENT.

The plaintiff in error was indicted in the Circuit Court for Wakulla county for burning, in the night time, a certain outbuilding described as a cotton house,

16

belonging to Ed. Whaley, and upon an arraignment and trial at the Fall term, 1892, of that court was convicted of the offense charged against him. A motion for a new trial on the ground that the verdict was contrary to law and the evidence was overruled by the court, and the accused was sentenced to hard labor in the State prison for twelve months.

The only question to be considered in the record brought here by writ of error is, does the evidence justify the verdict?

Ed. Whaley testified for the State, in substance, that about one hour by sun in the morning he was told his cotton house was burned, and that he determined to get some neighbors to help him look for signs of the person who burned it. After breakfast he went to the houses of Wakulla White and Joe Winburn, and got them to go with him in the direction of the burnt house. About two hundred yards from where the house stood they discovered along a turn row in the plowed ground the track of a man wearing about a number eight shoe that "turned the toe of his left foot in a little, and dug up the ground with the toe of his right foot as he walked." They followed this track "a piece, then it turned out, going around over plowed ground to a magnolia tree standing about thirty yards from the corner of the burnt house." No tracks could be seen under or immediately around the tree on account of leaves and trash. Saw some tracks leading away from the tree surrounding towards the site of the

burnt house, and they led up to where the corner of
the building had been. They "were bare-foot or
stocking-foot tracks, or something." The parties fol-
lowed the "bare-foot or stocking-foot tracks" away
from the site of the house over cultivated land for
about three hundred yards to a place where an old fence
had been on fire that morning and there lost them. Many
colored people had been fighting fire there that morn-
ing and there were many shoe tracks and bare-foot
tracks around where the fence was burned. The wit-
ness and his neighbors then started to go over to Mr.
Steve Mathers' house, where J. C. Whetston lived, and
went across a field and through a strip of woods. On
the far side of the woods, about a half mile from where
they left the bare-foot track at the burnt fence, in Mr.
Mathers' field they came across a man's shoe track.
Witness knew it was the same track that he had seen
in the plowed ground going towards the magnolia
tree, by the fact that the "toe of the left foot was
turned in a little, and the toe of the right foot dug up
the dirt." This was the only way he recognized it.
They then followed this shoe track across Mathers'
field to a fence where it crossed over and followed the
big road. They followed this track down the road
nearly to Mr. Mathers' gate. They did not look to
see whether or not the track went on down the road
beyond the gate, nor did they look for any tracks
from the big gate up to Mathers' house. They went
up to the house and found that Mr. Mathers, J. C.
Whetston and a colored woman had gone down to the
"greens patch," and the witness and his party joined

them there. This was on Sunday morning. Witness and his neighbors with him spoke, but did not say anything about following tracks, or that they were hunting for signs of the person who burnt the house. Nothing was said on this subject. After a little while the witness and J. C. Whetston went together to the house. Witness has never said anything to Whetston about following the track as his, or that he was suspected of burning the cotton house. That the burning took place in Wakulla county, State of Florida, at some time between the afternoon of Saturday, April 9th, 1892, and about an hour by sun the next day. Witness did not remember being on "Dickenson's Bay" with defendant since the burning of the house. He remembered going to the bay in the winter, but did not know how long he stayed and could not then recollect of being with defendant there.

Joe Winburn was examined for the State, and his testimony is substantially the same as the foregoing testimony of Ed. Whaley, except that Winburn further says that as Whaley and Whetston walked up to the house from the "greens patch," he looked at the track made by Whetston in the patch and recognized it as the same track he had seen near the burnt house and in the field. It was about a number eight shoe. He has never at any time said anything to Whetston about following the track.

It is recited in the bill of exceptions that Wakulla White was also sworn as a witness for the State, and testified substantially to the same effect as Whaley and Winburn.

Stephen Mathers also testified for the State that J. C. Whetston was living on his (Mathers') premises at the time Whaley, Winburn and White visited his house together, and that Whetston occupied an out-house as his quarters. In the early part of the Saturday night before the Sunday morning in question Whetston was away ·from home. Witness heard him when he came in, and supposed it was somewhere about eleven or twelve o'clock. There was no time-piece in the house.

Mrs. Mather· also testified that she heard Whetston when he came home on Saturday night; knew it was he by hearing the chain on his door rattle. She thought it was a little before or about mid-night, if not a little after. No clock was in the house.

Thomas White, a witness for the State testified that about ten o'clock on Saturday night before the Sunday when his father, Wakulla White, Joe Winburn and Ed Whaley saw the tracks in the field, he in company with Kirk Pigott, in approaching the house of a colored man named Alf Rosier, saw J. C. Whetston cross the road in the direction of the cotton house, and he asked Doc King, a colored man, who it was.

Kirk Pigott corroborated the testimony of Thomas White.

Sam Rosier and Doc King were also examined for the State, and testified that J. C. Whetston was at the house of Alf. Rosier on the Saturday night in question, and that he left there after Alf Rosier came home, between ten and eleven o'clock, as near as the witness could guess.

The statement of the accused under oath is in substance as follows: That he lived at the time on the premises occupied by Stephen Mathers, in Wakulla county, Florida, and on the Saturday in question sent by Alf Rosier to town for some tobacco. After supper he left Mathers' house and went to Alf Rosier's to get the tobacco, and on arriving there he found that Rosier had not come home. He sat in Rosier's house awaiting his coming, which was quite late in the night; could not say just when it was. Rosier finally arrived and in reply to defendant's complaint at his delay, stated that he (Rosier) had stopped somewhere to attend church. After getting the tobacco the defendant left the house and crossed the road to get into the bushes for the purpose of relieving himself. At the time he crossed the road, two persons were coming down it, and were making a great noise. Defendant thought they were a little drunk. After he got into the bushes he heard Thomas White ask Sam Rosier if it was not Jack Whetston who crossed the road, and heard the negro say "yes." Defendant was near at the time, and recognized Tom White and young Pigott. In a few moments after this defendant stepped into the road and went home at Stephen Mathers', where he went to bed, he supposed somewhere about eleven o'clock; may have been later. That he did not burn Whaley's cotton house; never saw it in his life, and was never near it that he knew of. For some years Ed Whaley and Wakulla White had evinced enmity against him; he never knew why. In times past they killed his stock, and he and they

were not intimate neighbors, and he did not go about their premises. After the time these parties were at Steve Mathers' they were oystering on "Dickenson's Bay," and defendant camped with them, and they chatted and smoked together; neither Whaley nor White ever alluded to any connection of his with the burning of the cotton house, and he knew nothing of the matter until after indictment and arrest in Crawfordville during Spring court.

W. W. Walker testified that he had known the defendant intimately for thirty-five years, and was familiar with his general reputation in the community in which he lived for "probity, integrity and general honorableness of character," and that it was good.

In rebuttal, the State examined the witnesses Whaley, Wakulla White, Winburn and also S. K. Wallace, all of whom testified that the defendant's general reputation as above was bad.

The other facts in the case are stated in the opinion of the court.

*R. C. Long* for Plaintiff in Error.

*The Attorney-General* for Defendant in Error.

MABRY, J.:

The State relies entirely upon circumstantial evidence to connect the accused with the burning of the cotton house. That this character of evidence may establish guilt is beyond question, and our own court

has approved the statement that "a well connected train of circumstances is as conclusive of the existence of a fact as is the greatest array of positive evidence." Whitfield vs. State, 25 Fla., 289, 5 South. Rep., 805. The value of this kind of evidence consists in the conclusive nature and tendency of the circumstances relied upon to establish any controverted fact. They must not only be consistent with guilt, but must be inconsistent with innocence. Mr. Starkie says, in his book on Evidence, that "such evidence is always insufficient, where, assuming all to be proved which the evidence tends to prove, some other hypothesis may still be true; for it is the actual exclusion of every other hypothesis which invests mere circumstances with the force of proof. Whenever, therefore, the evidence leaves it indifferent which of several hypotheses is true, or merely establishes some finite probability in favor of one hypothesis rather than another, such evidence can not amount to proof, however great the probability may be." 1 Starkie on Evidence, 444. Again, this author says, on page 447, same volume: "What circumstances will amount to proof can never be matter of general definition ; the legal test is the sufficiency of the evidence to satisfy the understanding and conscience of the jury. On the one hand absolute, metaphysical and demonstrative certainty is not essential to proof by circumstances. It is sufficient if they produce moral certainty to the exclusion of every reasonable doubt; even direct and positive testimony does not afford grounds of belief of a higher and superior nature."

Traces, marks or indications discovered at or near the scene of the crime tending to connect the accused with them, and pointing to him as the guilty agent, may be shown in evidence to establish the charge against him. Among these indications, foot prints found at or near the place where the crime was committed, along with the discovery of the crime, corresponding with the tracks of the accused, are most frequently resorted to for the purpose of identifying him as the guilty party. Burrill on Circumstantial Evidence, 264; Wharton's Criminal Evidence, sec. 796; Young and Griffin vs. State, 68 Ala., 569. The effect or sufficiency of the evidence in reference to correspondence of tracks discovered at or near the scene of a crime with those of the accused, does not seem to be susceptible of being definitely stated. Mr. Wharton says that "the character of foot-prints leading to the scene of murder and their correspondence with the defendant's feet, may be put in evidence in cases where the defendant's agency is disputed. Such evidence is not by itself of any independent strength, but is admissible with other proof as tending to make out a case." Wharton's Criminal Evidence, 796. Burrill draws a distinction between ordinary foot prints, exhibiting no peculiar characteristics, and those of a rare and peculiar character. He says: "Where no peculiar marks are observed, but the correspondence thus proved is merely in point of superficial shape, outline and dimensions, and those of the

ordinary character, it may serve to confirm a conclusion established by independent evidence, but can not be in itself safely relied on, on account of the general resemblance known to exist among the feet and shoes of persons of the same age and size. But where certain peculiarities are observed which at once distinguish the impressions from all others, an exact correspondence, verified by the test of comparison, becomes of the highest importance, and the value of such coincidences is obviously increased with the number of the peculiar marks observed." Burrill on Circumstantial Evidence, page 267. He also says it is essential that the correspondence between the tracks and the feet or shoes of the accused to have a decisive bearing should be proved by actual comparison, as by bringing the two objects into juxtaposition and placing the shoe upon the impression. *Ibid.*

In Green vs. State, 17 Fla., 669, the only evidence relied upon by the State to convict the accused, was the correspondence of tracks discovered at or near the house where the offense was alleged to have been committed, and those made by him. The track in question in this case was said to be peculiar in this, that in consequence of a bent leg of the defendant, in walking the heel of his right foot scarcely touches the ground. The conviction of Green, it was held, could not be sustained on the evidence. The opinion, it is true, shows that there was conflict in the evidence for the State in reference to the tracks, and also that

there was nothing to indicate that the accused made the assault with the intent to rob, with which he was convicted; but still the view is expressed that the evidence of tracks alone was not sufficient to sustain a conviction.

Turning to the testimony in the case before us, and conceding that Wakulla White and Joe Winburn testified to the same facts, we have two witnesses who state that they looked at the tracks made by the accused in the path as he walked up from the "greens patch," and recognized them to be the same as those seen near the burnt house and in the field. There was no measurement of the tracks, or actual comparison by placing the shoes of the accused upon the impressions near the house or in the field. The way the witnesses arrived at their conclusion that the tracks were the same was by observing the two tracks some distance apart. The shoe worn by the accused is stated to be about a number eight, but there are no peculiar characteristics mentioned in reference to this shoe. It is true that the witnesses say they recognized the tracks as the same, because the toe of the left foot turned in a little, and the right foot dug up the dirt, but how far these features can be regarded as distinguishing the track in question from all others is uncertain. That the left foot of an ordinary shoe track is turned in a little and the right digs up dirt, can not, we think, be considered as much of a marked peculiarity. The lack of any other unusual and peculiar characteristics, taken in connection with the failure to

measure the tracks, or test them by actual comparison, deprives them, standing alone, of the probative force given to tracks of marked peculiarities distinguishing them from others when the correspondence has been verified by the test of actual comparison.

There is one other circumstance against the accused which must be considered in connection with the tracks, and that is, that he was absent from home in the first part of the night in which the house is alleged to have been burnt, and was seen by two witnesses crossing the road near Alf. Rosier's house in the direction of the burnt house. Leaving out of consideration the statement of the accused, it is clear that he was at the house of Alf. Rosier that night until sometime between ten and eleven o'clock. The time when the accused got home that night is not very definitely fixed. Mathers says he supposed it was somewhere about eleven or twelve o'clock. Mrs. Mathers thought it was a little before or about midnight, if not a little later. There was no time-piece in the house. The accused says that he remained at Rosier's until his return, for the purpose of getting some tobacco sent for that day by Alf. Rosier. In this he is partly corroberated by the State witnesses, Sam Rosier and Doc King, for they say he remained until Alf. Rosier returned home. It does not seem to have been developed how far Alf. Rosier's house was from either the burnt house or Mathers' place, and the force of the evidence that accused crossed the road in the direction of the

burnt house is not strengthened by any showing that he was near the burnt house at the time. The affirmative showing that the accused was absent from his. home in the first part of the Saturday night, and returned home at a late hour is a circumstance against him. Yet, if the cause of his absence and his whereabouts while absent are shown, and no connection between them and the crime appears, the force of this circumstance is greatly weakened, if not entirely overcome. Nothing being said about the distance from Rosier's house to the residence of Mathers, and the time when the accused left Rosier's and when he arrived at home being so short, there is no room for much unfavorable presumption against him on account of his absence, and especially as it is not shown how much time would be consumed by him in deviating from his course, if such was required, in going and returning from the burnt house. This is left in uncertainty.

There is in the testimony relied upon by the State an element of weakness that is calculated to impair materially, we think, the force of the legitimate inferences that otherwise might flow from it. It is brought out by the witnesses for the State that a fence situated about three hundred yards from the house alleged to have been burned by the accused, was on fire early in the morning of the day the house was discovered to have been burned, and that many persons were there putting out the fire. Whether the

cotton house was burned before or after the fence caught on fire, is not shown, nor is anything disclosed as to the origin of the fire in the fence, although it appears that many persons were there putting it out. We can not infer that the fence caught from the cotton house any more than we can infer that the house caught from the fence, as it is not known which one was on fire first; yet it may be that the fence first caught and the fire was communicated from it to the house. Here again the testimony leaves the matter in uncertainty. Giving due weight to the only two circumstances relied upon to sustain a conviction, as well as the other circumstances attending the case, we think they are not sufficiently conclusive to sustain the verdict, when tested by the legal rules announced in the first part of this opinion. The witnesses had it in their power to make an actual test of the correspondence of the tracks by comparison or measurement, but this they did not do, and in fact did not even inform the accused at the time that he was suspected of the crime. His absence from home on Saturday night is explained, and no contradiction of it. Where the circumstances put in evidence are sufficient to justify an inference of guilt, and a jury returns a verdict upon them, we are not disposed to disturb it; but the circumstances in the case before us are not sufficient in our judgment to justify a finding against the accused.

The judgment of the Circuit Court, is, therefore, reversed, and the cause remanded. Ordered accordingly.