MATH DAVIS AND OTHERS, *Plaintiffs in Error,* v. THE STATE OF FLORIDA, *Defendant in Error.*

Opinion Filed April 13, 1915.

1. Under an indictment charging three men for the murder of A, the evidence being circumstantial, A's wife may testify that a man came to their home at night, representing himself as a deputy sheriff and that two other deputy sheriffs were with him, thereby inducing her husband to go with him.

2. A single assignment of error addressed to the refusal of

26—Vol. 69.

several separate instructions will fall if one of the instructions was properly refused.

3. When several defendants are jointly indicted, an instruction is properly refused that calls for the acquittal of all, if a juror entertains a doubt as to one only.

4. If evidence of an alibi be offered as to one only of several defendants, an instruction giving all the benefit of an alibi is properly refused.

5. The evidence sustains the verdict.

Writ of Error to Circuit Court for Calhoun County; D. J. Jones, Judge.

Judgment affirmed.

ELLIS, J., dissents.

*Smith & Davis* and *Thos. E. Walker*, for Plaintiffs in Error;

*T. F. West*, Attorney General, and *C. O. Andrews*, Assistant, for the State. *W. H. Price*, Marianna, Florida, assisted State with oral argument in Supreme Court.

COCKRELL, J.—Math Davis, B. M. Franklin and Ben McDaniel were jointly indicted for the murder of Eunie Johnson. They were all convicted of murder in the second degree and sentenced to life imprisonment.

The evidence for the State was largely circumstantial. The theory of the State was that these white men went to the home of the negro Johnson, represented that they were deputy sheriffs with a warrant for his arrest, enticed

him away from his home, then shot and disemboweled him, cut off a finger and an ear and then hid his body in a small stream. The homicide took place while the court was in session and the indictment and conviction followed promptly.

The testimony placed these men near the Johnson home under suspicious circumstances about the time that an unidentified man went to the house and called Johnson to the door. Johnson's wife was in the house at that time and was permitted to testify that this man represented himself to be Cayson, a deputy sheriff, and further that there were two other men with him with a warrant for Johnson's arrest. Johnson dressed and went off with this man. His wife saw but the one man—it was at night and she did not recognize him, nor did she see her husband again. His body was found the next day.

It is objected that the verbal statement of this unidentified man was improperly admitted because it was not shown that any of these plaintiffs in error were present. It is clear that if the State's theory be correct, that this was but the initial step by some one in the conspiracy, and the inability of this negro woman to identify with certainty which one it was does not destroy the admissibility of the evidence. See Sumpter v. State, 45 Fla. 106, 33 South. Rep. 981. The representations or statements did not in the remotest degree tend to identify these plaintiffs in error as being in the plot to decoy Johnson from his home. The only names mentioned were those of two deputy sheriffs presumably well known in the locality, and the evidence was proper to show the plot and to explain why Johnson, without demurring, got up, dressed himself and left his home peacefully under the assumed protection of the law. We find no error here.

. A single error is assigned upon the refusal to give thirteen separate instructions. We are, under repeated rulings of this court, compelled to go no further than to ascertain that one of these separate instructions was properly refused. Charles v. State, 58 Fla. 17, 50 South. Rep. 419. The first special instruction refused reads: "It is the duty of each individual juror to be satisfied beyond a reasonable doubt of the correctness of any verdict of guilt, and if, after a fair and free conference and consultation with his fellows on the evidence, and an individual juror has a reasonable doubt as to the defendant's guilt or the guilt of either of them, it is the duty of such juror under his oath to retain such doubt and to refuse to concur in any verdict of guilt while he has such reasonable doubt." The vice in this instruction is obvious. It compelled a mistrial as to all three of the accused if one individual entertained a doubt as to the guilt of one only, and moreover we have disapproved the policy of thus encouraging the individual juror to stand out against the views of his fellows. Baldwin v. State, 46 Fla. 115, 35 South. Rep. 220; Cook v. State, 46 Fla. 20, 35 South. Rep. 665; McCall v. State, 55 Fla. 109; Ayers v. State, 62 Fla. 14.

In the oral argument before this court the plaintiffs in error sought to amend this assignment of error and to confine it to the refusal to give one specific charge as to the quantum of proof when the defense of an alibi is offered. That instruction, however, was incorrect in that it required an acquittal of all three defendants, when the nearest approach in the testimony tending to establish an alibi was offered only as to one of the defendants. Upon the evidence and the other charges given, we feel reason-

ably certain that the jury gave this defendant whatever consideration he may have been entitled to on this point.

There remains but the assignment upon the alleged insufficiency of the evidence to support the verdict. Though the evidence be circumstantial, in the sense that no eye-witness actually saw the killing, a careful and painstaking examination justifies this court in upholding the Circuit Judge in refusing to set aside the verdict upon the grounds urged. The lack of motive directed against the particular negro so slain and mutilated but emphasizes the atrocity of the crime, and the judgment and sentence will be affirmed.

TAYLOR, C. J., AND SHACKLEFORD AND WHITFIELD, JJ., concur.

ELLIS, J., dissenting.

I am unable to concur in the judgment and opinion of the court. The evidence relied upon by the State for the conviction of the defendants was entirely circumstantial. On the 7th day of October, 1914, the body of a negro named Eunie Johnson was found in a branch about four miles south from where he lived, and about one and a half miles north of the town of Blountstown. There were several mortal wounds, some gunshot and some knife wounds upon the body. He had been dead several hours when found. The body appeared to have been mutilated by the amputation of one finger and the upper part of an ear. Eunie Johnson lived about a quarter of a mile east of the road leading from Blountstown to Marianna at a point about six miles north of Blountstown. Joe Frazier, another negro, lived about the same distance from Blountstown, and about the same distance from the road on the west side. On Tuesday night, October 6th, about

eight o'clock, a white man went to the house of Eunie Johnson, represented himself as an officer, and stated that he had a warrant for the negro. Johnson went away with this unknown white man in the direction of the public road, and was not seen alive again. The white man who called for Johnson had a gun. The wife of Johnson was at home at the time, and saw the man. She said that the man was not the defendant Ben McDaniel, and that he did not look like either B. M. Franklin or Math Davis, although she could not say it was neither one of them.

About that hour of the night the three defendants were seen on the public road with a Ford automobile at a point between the houses of Johnson and Frazier. Two of them that night went to Frazier's house and one of them killed a dog there. Their actions that night on the public highway and in that neighborhood were very suspicious. In this neighborhood and near the public road and between the homes of Johnson about a quarter of a mile east of the road, and Frazier's about a quarter of a mile west of the road, are the houses occupied by George Hansford and W. C. Pelt to the east and Lewis Hardwick to the west. From this point several miles south and about two miles from Blountstown the road forks, one arm leading abruptly to the east into a swamp, and crosses the branch in which the body of Johnson was found Wednesday, October 7th; the other arm of the road continues in a southerly direction to Blountstown. The track of a Ford automobile was discovered in the road leading eastward into the swamp and up to the branch in which about two hundred yards above that point the body of Johnson was found. In this road about the point where it crossed the branch, the automobile had turned around, there were signs of a struggle, and where a fire had been built; from

this point there were signs of where a body had been dragged northward about two hundred yards to the point where the body of Johnson was found. One of the men, Ben McDaniel, on Tuesday night had a gun with him, but whether it was a double barrel or single barrel gun, is not known. When one of the witnesses went to Ben McDaniel's house after the body of Johnson was found, he saw two guns, each gun showed signs of having been discharged since it was last cleaned. Math Davis undertook to establish an alibi and failed. The jury evidently believing that he was one of the party of three in the automobile Tuesday night in the neighborhhood where Johnson, Frazier, Pelt, Hansford and Hardwick lived. That one of the party after the visit to Frazier's house and the killing of the dog there, went to the house occupied by Johnson, represented himself as a deputy sheriff with a warrant for Johnson, took him away from home to the automobile where the other two were waiting, and carried him into the direction of Blountstown until they arrived at the forks of the road and then carried him to the branch which crossed the east fork of the main road and murdered him, concealed his body in the stream about two hundred yards above where the car stopped, is a theory entirely consistent with the evidence. The defendants could have perpetrated this outrage, but the question for the jury to have determined before they were authorized to convict, was the following: was the evidence inconsistent with any other reasonable hypothesis? The law as applied to circumstantial evidence, where that character of evidence is relied upon by the State for conviction is as follows: "A well connected train of circumstances is as conclusive of the existence of a fact as is the greatest array of positive evidence" (Whitfield v. State, 25 Fla. 289, 5 South. Rep. 805) ; "but the value of this kind of evi-

dence consists in the conclusive nature and tendency of the circumstances relied upon to establish any controverted fact. They must not only be consistent with guilt, but must be inconsistent with innocence." Whetston v. State, 31 Fla. 240, 12 South. Rep. 661; Kennedy v. State, 31 Fla. 428, 12 South. Rep. 858; Grantling v. State, 40 Fla. 237, 23 South. Rep. 857; 17 Cyc. 817; 12 Cyc. 488. The circumstances must not only agree and be consistent with the theory of the guilt of the accused, but they must be inconsistent with the hypothesis that he is innocent, and with every other reasonable hypothesis except that of guilt. See Bryant v. State, 116 Ala. 445, 23 South. Rep. 40; People v. Ward, 105 Cal. 335, 38 Pac. Rep. 945; Coleman v. State, 26 Fla. 61, 7 South. Rep. 367; Andrews v. State, 116 Ga. 83, 42 S. E. Rep. 476; Carlton v. People, 150 Ill. 181, 37 N. E. Rep. 244; Wantland v. State, 145 Ind. 38, 43 N. E. Rep. 931; People v. Aiken, 66 Mich. 460, 33 N. W. Rep. 821; Webb v. State, 73 Miss. 456, 19 South. Rep. 238; Territory v. Rehberg, 6 Mont. 467, 13 Pac. Rep. 132; Smith v. State, 61 Neb. 296, 85 N. W. Rep. 49; Buel v. State, 104 Wis. 132, 80 N. W. Rep. 78; King v. State, 120 Ala. 329, 25 South. Rep. 178; Kennedy v. State, 31 Fla. 428, 12 South Rep. 858; 1 Greenleaf on Evidence (16th ed.) sections 11-12.

In this record there is no fact or circumstance which connects the defendants or either one of them with the disappearance of Eunie Johnson. There is nothing to show that they went out that night to see Johnson, nor that they expected to see him, nor that they actually saw him. The tracks which the witness Green measured at the place where the crime was supposed to have been committed was not shown to correspond with the track of either one of the defendants, the witness was willing to swear and

did so testify that it was the "same track" that he measured at McDaniel's place, but he could not swear that it was the same track as the one which McDaniel showed him as being McDaniel's track; nor did he know that the measurement "would compare" with Ben McDaniel's track. The two tracks were the tracks of about a number eight shoe. There was nothing peculiar about the tracks except they were wide at the ball of the foot and narrow at the toe. This evidence was not sufficient to show that Ben McDaniel made the two tracks. The description of those tracks by the witness Green showed them to be such tracks as would be made by one wearing a shoe of a size and shape which is in very common use.

The testimony of Mr. Barber as to the sale of Gasoline to McDaniel for use by Stubbs Franklin and about McDaniel's going up the road, and that of Mr. Collins as to the statement by Ben McDaniel that he and Franklin were going up the road to serve a summons on a negro, tend to identify these men as two of the men who had the automobile in the Pelt-Hardwick neighborhood. The evidence of Middlebrooks established the presence of two of the men, Franklin and McDaniel, at the house of Frazier, that evidence was not inconsistent with the story of Franklin, who said that he and McDaniel went to Frazier's house because McDaniel had an appointment with Frazier who had promised to "put him next to a negro up there by the name of Charlie Smith." There was nothing to show that McDaniel did not have a warrant for the man Smith. When Alexander and his wife returned from delivering the dog at McDaniel's house, he saw an automobile standing outside the road ten or fifteen steps from Mr. Hardwick's fence. it looked like the car he had seen earlier that night near the same place in which were the

three defendants, but he was not able to swear that it was the same car; nor did his wife swear that it was the same car. It looked like the car, however, that was owned by Franklin and exhibited at the trial as evidence. The jury believed that it was Franklin's car probably, but does the fact that it was his car connect him or its occupants in any way with Johnson's disappearance? John Parish, Sr., was at McDaniel's house Tuesday night when McDaniel came in and a few minutes afterwards left the house in a car going up the road. Parish then went home and retired; he afterwards heard two cars come "back down the road," one of these cars was probably Franklin's; Who were the occupants of the other car? Is it more likely from the evidence that Johnson was in Franklin's car than that he was in the unknown car? The two cars which Parish heard coming "back down the road" must have passed after nine o'clock according to the testimony of Coxwell, who left Mr. Pelt's about nine o'clock, and who heard a car go up the road, but none came back before he left Pelt's house. The gun wads found at the place where Johnson was supposed to have been killed were used in a twelve gauge gun, and the two guns found by Mr. Green at Ben McDaniel's house were of twelve gauge, but is not a twelve gauge a very common sized bore for a shot gun?

I think the evidence was insufficient to sustain the verdict. It fails wholly to connect the three defendants, or any one of them, with the disappearance of Johnson; it brings them no nearer to Johnson's house than the public road which was one of the main thoroughfares of the county and a quarter of a mile from his house; it shows no motive for the commission of the crime; nor is any connection shown between the tracks of the automobile

at the place where the crime was supposed to have been committed and the automobile used by the three defendants that night, except that they were the tracks of a Ford car, and Franklin's machine was a Ford. But it would not be very far wrong to say that the track of a Ford machine in these days on the public highway and in even obscure neighborhood roads is almost as common as that of a one horse wagon. The tracks of the car's wheels in the swamp road were shown to be 30x3 in front and 30x3 1-2 on the rear wheels, the size of the tires on Franklin's car is not shown, the statement of Franklin before he was arrested that he expected to be arrested, was a very damaging one to make, but it was not a confession. The circumstances in my judgment point with very grave suspicion towards the defendants, but it cannot be said that they "exclude very reasonable theory but that of the defendant's guilt." The circumstances are suspicious, but suspicious circumstances alone are not sufficient to warrant conviction. Wills' Circumstantial Evidence, p. 82.

Suppose the tires on Franklin's car were not 30x3 in front and 30x3 1-2 on the rear wheels, then here would be a fact wholly inconsistent with the theory of guilt in this case. Are we to presume that the tires were of that size in aid of conviction? Did the jury so presume the existence of such fact? Without the existence of this fact established to a moral certainty not invoked by presumption against the defendants the chain of circumstances was broken and incomplete. The circumstances all taken together must be of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion and producing in effect a reasonable and moral certainty that the accused and no one else committed the offense charged. It is not sufficient that the facts create a strong proba-

bility, if therefore assuming all the facts to be true which this evidence tends to establish they may be accounted for on any theory which does not include the guilt of the defendants, the proof fails to make out the charge. Wills Circumstantial Evidence, p. 262. The evidence may be sufficient to establish a moral probability of the guilt of the defendants, but it is not sufficient to establish conviction to a moral certainty.