MARCUS PATE AND EMMETT PATE, *Plaintiffs in Error,* v.
THE STATE OF FLORIDA, *Defendant in Error.*

Opinion Filed July 25, 1916.

1.  Where circumstantial evidence is relied upon by the State for
    conviction in a criminal prosecution, the circumstances taken
    together must be of a conclusive nature and tendency leading
    on the whole to a satisfactory conclusion and producing in
    effect a moral certainty that the accused and no one else
    committed the offense, before a verdict of guilty is justified. It
    is not sufficient that the facts create only a strong probability
    of guilt.

2.  Evidence examined and found to be insufficient to support a
    verdict of guilty against the defendants charged with larceny.

Writ of Error to Circuit Court, Bay County; D. J.
Jones, Judge.

Judgment reversed.

*Mathis, Price & Weeks,* for Plaintiffs in Error;

*T. F. West, Attorney General,* and *C. O. Andrews,
Assistant,* for the State.

ELLIS, J.—The plaintiffs in error and Press Godwin
and Jack Vann, *alias* Jack Harrell, were indicted by the
grand jury of Bay county for the larceny of a "heifer of
the bovine species," alleged to be the property of Watts
Gainer, on the third day of August, 1915. At the trial
which was held in November, 1915, the jury returned a
verdict of guilty as to Marcus and Emmett Pate and Press
Godwin, and not guilty as to Jack Vann, *alias* Jack Har-
rell.

A motion for a new trial in behalf of the three defendants who were convicted was granted as to Press Godwin and denied as to Marcus and Emmett Pate, who are hereinafter referred to as the defendants.   Judgment was entered against the defendants, who were sentenced to a term of two years in the State prison.

The motion for a new trial contained five grounds. The first four embrace the proposition that the verdict was not justified by the law or evidence, and was contrary to the charge of the court.   The fifth ground was based upon newly discovered evidence recited in the affidavits filed with the motion, and which were asked to be taken and considered as a part of the motion.   There are four assignments of error, the second of which is abandoned. The last assignment of error rests upon the order of the court overruling the motion for a new trial in so far as that motion challenged the sufficiency of the evidence to establish the guilt of the defendants beyond a reasonable doubt.

The evidence upon which the State relied for conviction was entirely circumstantial.   The testimony adduced at the trial as to the circumstances which appear to have had any relation to, or bearing upon, the charge was not uncontradictory in character, the witnesses not being able to agree on many of the facts constituting the so-called chain of circumstances.

The defendants and their wives, Jack Vann or Harrell and three children, and a negro man constituted a party of nine, which on the afternoon of Thursday, August 12, 1915, having left their homes some miles away, upon a fishing trip, encamped in what was known as the "Fishing Woods" between Big and Little Island Ponds, in Bay county.   The party came in two wagons, one wagon drawn by two mules and the other by a horse, and en-

camped near Big Island Pond at a spot which had been the camping ground for outing parties for many years. This party brought with it food to supply its wants for several days. The women had prepared chicken, beef and kid, a supply of meal and vegetables and other articles necessary to the preparation of meals were taken along; cooking utensils and dishes were also on hand. The negro boy went along as cook for the party. One of the defendants carried a gun. It belonged to his father, and was borrowed from him to take on the trip. The gun was a single barrel magazine shot gun, number ten gauge, and was the only gun in the party, so far as the evidence discloses. When the defendants and their party were entering the woods that Thursday afternoon, about three miles from the camp ground, they met a party consisting of two white men and a negro coming out. They were in a wagon drawn by a mule and horse according to the recollection of one of the defendants' party, and by two mules according to another member of the party. Upon arrival at the camping ground, it was discovered that a camp fire had been recently built there. The ashes from the fire were still warm. A State witness named Alex Morrell, a woods rider for a turpentine company, said he passed the camping ground on his rounds once a week, sometimes oftener. That he saw a party camping there Saturday, August 14th, but hadn't seen anybody camping there recently before; not within two or three months; but upon cross-examination he said: "If there had been anybody else camping there during that week, I would not have seen them." Saturday afternoon one of the defendants taking the wagon drawn by the two mules, went to the homestead of Mrs. Harrell after some hogs which he brought with him back to camp and carried home. The two defendants and Jack Harrell went after the hogs, leaving

at the camp their wives, the three children and the negro boy.  The party left the camp Sunday, August 14th, about noon upon the return trip home, arriving at the latter place sometime Monday following.

Sometime during the day of the Wednesday following, which was August 18th, 1915, two men named Alex Morrell and A. R. Wells being in the vicinity of Big Island Pond, discovered the hide, head and feet of a "yearling" buried in the ground near a log; a little distance away the entrails of the animal had been buried. The witnesses said the animal seemed to have been butchered at that spot.  Nearby were the tracks of a wagon and two mules which came from a southerly direction, went to the northward, turned around the "butchering ground" and went in a southwest direction to level ground.  They followed the wagon track for about three quarters of a mile to where the track entered the road about forty yards from the camp.  The witness Morrel said the "wagon tracks were about $2\frac{1}{4}$ inches wide," evidently referring to the width of the tires upon the wheels.  The witness Wells said the "wagon tire was about an inch and a half, something like that."  The witness Morrel said that the hide was in a state of decay, "the hair slipped off of it easily."  The color of the hair showed that the animal was "red sided."  The witness spoke of it as a "Frosted yearling," and that it was marked with a "swallow-fork in one ear and crop, split and under-bit in the other," and he could not swear whether the hide was that of a male or female.  The witness Wells said the mark was a "crop split and under-bit in one ear and a swallow-fork and over-bit in the other," and in his judgment the animal was a "heifer."  At the camping ground where the defendants had camped these witnesses found some beef bones, they appeared to be fresh.  In one side of the neck of the hide

a number six shot was found.   Upon the camping ground
a number 12 gauge cartridge was found loaded with the
same  size  shot.   Watts  Gainer,  whom  it  was  alleged
owned the animal, testified that his cattle were branded
with the letter "G" and marked with a "crop, split and
under-bit in one ear and over-bit in the other."   The wit-
nesses who found the hide discovered no brand on it, and
the witness Wells said that Watts Gainer's mark was "a
crop, split and under-bit in one ear and a *swallow-fork*
and over-bit in the other."   L. C. Tyson said that he lived
near Big Island Pond and saw the defendants' party at
the camping ground Thursday night and Friday morning,
and that nobody had camped there within eight or nine
weeks before that time; that he passed that spot every day
or two during the summer.   This witness, one of his sons
and a man named Jim McDonald all live within a mile or
two of the spot where the hide was found buried.   A wit-
ness named Lang Gainer, a cousin to Watts Gainer, said
that the latter had cattle in the woods near the two ponds,
and that among them was a "red sided looking heifer"
that he knew of, that she was between a "year and a half
and two years old" and was marked with a "crop, split
and under-bit in one ear and swallow-fork and over-bit in
the other," which he said was Watts Gainer's mark; that
he saw the red sided heifer in July or August; it was in a
little pond about a mile north of Big Island Pond, and he
had not seen it since; that he and others marked the heifer
in the Spring.

When circumstantial evidence is relied upon by the
State for conviction, the circumstances taken together
must be of a conclusive nature and tendency, leading on
the whole to a satisfactory conclusion and producing in
effect a reasonable and moral certainty that the accused
and no one else committed the offense charged.   It is not

sufficient that the facts create a strong probability. If assuming all the facts to be true which the evidence tends to establish they may be accounted for upon any theory which does not include the guilt of the defendants, the proof fails to make out the charge. Wills' Circumstantial Evidence, p. 262. The value of circumstantial evidence consists in the conclusive nature and tendency of the circumstances relied upon to establish any controverted fact. They must not only be consistent with guilt, but must be inconsistent with innocence. See Whetston v. State, 31 Fla. 240, 12 South. Rep. 661; Kennedy v. State, 31 Fla. 428, 12 South. Rep. 858; Gantling v. State, 40 Fla. 237, 23 South. Rep. 857; Jenkins v. State, 35 Fla. 737, text 830, 18 South. Rep. 182. The facts constituting the chain of circumstances must be established to a moral certainty and not invoked by presumption against the defendants, and if any of such facts constituting a chain of circumstances sufficient to convict is not so established then the chain is broken and incomplete and cannot be said to be sufficient to satisfy the mind and conscience of the jury. The circumstances should produce moral certainty to the exclusion of every reasonable doubt and each material circumstance should be established to the same degree of certainty and constituting an unbroken chain of facts sufficient to satisfy the understanding and conscience of the jury.

We think that the evidence in this case did not measure up to the standard approved by this court in the cases cited. The evidence of ownership of the animal alleged to have been stolen is by no means certain and clear. The hide which was found had no brand upon it, although the alleged owner said his cattle were branded with the leter "G." The ear-marks upon the ears of the animal whose hide was found were different from those in which

the owner said his cattle were marked. Although one witness said that the earmarks of the alleged owner's cattle were the same as those appearing upon the buried hide as described by one of the two men who found it, yet the two men who found the hide did not agree as to what those earmarks were and neither of them said that the earmarks were the same as those in which the alleged owner said his cattle were marked. As to one ear, the marks appearing on the hide were a "crop-split and underbit" so far this was the alleged owner's mark, but as to which ear bore that mutilation, the evidence is silent, as it is regarding the ear in which the alleged owner so marked his cattle. The alleged owner said that his mark consisted also of an "over-bit in the other" ear, but the hide of the animal bore in the other ear the mark of a "swallow fork" according to one of the two men who found it, and according to another a "swallow fork and over-bit." When the ear marks of an animal are relied upon for its identification in a prosecution for larceny of the animal, such marks should be established to that degree of certainty required as to the establishment of any other material circumstance. That method of identification and proof of ownership at best cannot be said to be the surest and safest method, for there is always the possibility that the cattle of other people in the community are in the same mark, and when the marks are not described with reference to the ears which carry them, this method of identification becomes even less valuable. How then in this case can it be said that beyond a reasonable doubt the animal whose hide was found buried and whose ear marks were different from those in which the alleged owner said his cattle were marked was the property of Watts Gainer?

The witnesses in this case were permitted without ob-

jection from either side to speak freely concerning their judgment, impressions and opinions about some of the circumstances which may have been material. It was assumed by every one for instance that the animal was killed and butchered at the spot where the hide and "offal" were found buried. From this assumption and the fact that a shot was found in the neck near the head, it was doubtless further assumed that the animal was killed by shooting it. The connecting link between the shooting of the animal and the defendants, was the finding of a twelve gauge shell, loaded with the same size shot, No. 6, as that found in the neck of the animal's hide, on the defendant's camping ground full three days after they had broken camp and departed, but the gun which the defendants were shown to have had on the camp was a ten gauge bore, and as twelve gauge shells are not usually shot from guns of ten gauge bore, a link in the chain of circumstances was broken, or at least decidedly weakened, and could only be strengthened by the further assumption that the defendants left the shell on the ground and because they left it there they must have had a gun from which shells of that gauge could be effectively discharged.

The wagon tracks which were followed from the assumed "butchering ground" to the road near the defendants' camp were shown by one witness to have been made by wheels carrying tires 2¼ inches wide, but by another witness the State showed that the tires were one and a half inches wide "something like that;" but the width of the tires on the defendants' two mule wagon were not shown.

About a quart of fresh beef bones were found on the camp ground; as these could not have been all the bones from the carcass of the "yearling" bovine about

"one and a half or two years old" it must have been assumed that the defendants disposed of the remainder before leaving camp, as they were not shown to have carried any of it away with them, and further that the bones found were left there by the defendants and that they were the bones of the butchered animal, and that animal was a "heifer of the bovine species," although one of the two men who found the hide could not distinguish its sex, and the other had an opinion that it was a "heifer," but gave no facts on which he based his opinion. One witness, A. J. Gainer, said the bones were eight or ten days old, but the defendants arrived on the ground only six days before the bones were found by that witness; this circumstance certainly is not consistent with the theory of guilt, and is not inconsistent with the theory that the bones were left on the ground by the persons who occupied the place before the defendants arrived, and the ashes of whose camp fire were warm when the defendants came.

Circumstances shown in evidence in a trial of this character may be suspicious, but suspicious circumstances alone are not sufficient to support a verdict of guilt. They must not only be consistent with the theory of guilt, but must exclude every other reasonable theory before the jury on such evidence is warranted in returning a verdict of guilt. See authorities cited above.

We think that the verdict should have been set aside and a new trial awarded. The judgment is, therefore, reversed.

TAYLOR, C. J. and SHACKLEFORD, COCKRELL and WHITFIELD, JJ. concur.