WILLIAM RAYMOND CARVER, *Plaintiff in Error*, vs. STATE OF FLORIDA, *Defendant in Error*.

En Banc.

Opinion filed April 24, 1931.

*W. D. Bell*, for Plaintiff in Error;

*Fred H. Davis*, Atty. Gen'l., *H. E. Carter*, Assistant, and *L. Grady Burton*, State Atty., for Defendant in Error.

PER CURIAM.—This writ of error was taken to a judgment of conviction and sentence of life imprisonment upon a verdict of guilty of murder in the first degree with recommendation to mercy, the defendant being indicted for uxoricide. There is also a petition for a writ of habeas corpus for bail.

No reversible error of law or procedure is made to appear.

There are many conflicts in the evidence which is largely circumstantial, the defendant being the only witness to the tragedy, which involved the killing of the defendant's wife and child and a negro man who was employed in the defendant's home. The defense was that the negro killed the defendant's wife and child in the day time with a muzzled hatchet while the defendant was asleep in another

room across the hallway on the same floor of the house; and that the defendant was awakened by screams, rushed across the hallway to his wife's room and saw his wife "slumped on the flooor" and the negro "standing there"; that defendant rushed back to his room, got his gun and in the hallway shot the negro several times, killing him. There was positive testimony that screams were heard after the shooting, and other evidence in support of the State's theory that the defendant shot and killed the negro and then killed his wife and child with a covered hatchet.

The record discloses a most unusual tragedy, and the conviction is of a most dastardly crime; but there is substantial unimpeached evidence to sustain the verdict and there is nothing to indicate that the jury were not governed by the evidence in reaching the verdict rendered.

Affirmed. Petition for a writ of habeas corpus denied.

WHITEFIELD, ELLIS, TERRELL AND BROWN, J.J., concur.

BUFORD, C.J., AND HUTCHISON, Circuit Judge, dissent.

DAVIS, J., disqualified.

BUFORD, C.J., dissenting:

This case is before the Court on its merits on a writ of error to the Circuit Court of Highlands County to review a judgment of conviction of William Raymond Carver of murder in the first degree with recommendation to mercy for which the sentence of life imprisonment was imposed and also upon petition for habeas corpus presented by the said William Raymond Carver praying he be allowed bail. We find two questions presented by assignments of error, either of which might be determinative of the legality of the judgment. Assignment of error No. 25 was that the Court erred in holding that the juror Langford was a proper juror to sit in trial of the cause. The assignment is based on the 17th ground of the motion for a new trial which was as follows:

"Because one of the jurors, to-wit: G. N. Langford, concealed from counsel for the defendant the fact that he was present at the scene of the alleged homicide on the day when the homicide was alleged to have been committed and only a short time after the hour when the said homicide was alleged to have been committed; that he then and there had opportunity to see the bodies of the deceased and to talk with witnesses who have testified in the case and to form his own opinion in regard to the manner in which the said homicide occurred. The stenographer's record showing the questions that were propounded to the said Langford and his replies thereto are herein and hereby referred to and made a part of this motion; that had said Langford advised counsel for the defendant that he was present at the house where the bodies were found and where the homicide was alleged to have occurred upon the same day when said homicide occurred and shortly thereafter, and that he had had an opportunity to study the scene and to talk with witnesses who were then and there upon the premises, that said juror would not have been accepted by the defendant as a juror to try said cause. An affidavit of C. P. Covington is hereto attached and made a part of this motion for a new trial in support of the ground herein last above alleged."

The record shows that when Langford was examined as a prospective juror in this case he was asked if he knew anything about the case and he answered in effect that he knew nothing except that it had happened. It developed after the trial that Langford was at the scene of the homicide soon after it occurred; that he saw the dead bodies, talked with witnesses and was in position to have acquired knowledge of a great many of the facts surrounding the homicide. His answer in reply to questions propounded by counsel on examination was misleading. It was further

developed after the trial that Langford was quoted as having, prior to the trial and after the homicide, expressed an opinion as to the guilt of the accused. Langford denied having expressed an opinion.

Be this as it may, there is grave doubt in my mind as to whether or not Langford was a fair and impartial juror. Certain it is that he weighed the evidence of each witness in the light of knowledge and information which he acquired by a personal inspection and view of the premises and the bodies and from information which he received on the ground immediately after the homicide and he would have necessarily discredited any witness whose statement as to the existence or non-existence of physical facts did not agree with his recollection of such physical facts.

In this case the State relied exclusively upon circumstantial evidence for a conviction. The undisputed facts were that on the afternoon of the 2nd day of April, 1930, Mrs. Ruth Stapf Carver, her infant son a little less than three years of age and a negro by the name of Ben Whitehead were killed in the Carver home at Sebring in Highlands County, Florida. Mrs. Carver and the little boy were killed by blows from a blunt instrument, supposedly a hatchet, inflicted upon the head of each. The negro was killed by Carver with a pistol.

The State contends that Carver killed the negro with a pistol, then killed his wife and child with a hatchet and intimates that the motive behind the killings was that Carver might collect life insurance by reason of the death of his wife.

Should that theory be accepted, there is no motive whatever shown for the killing of the negro. Neither is there any motive, reason or excuse shown for the killing of the

little boy, an innocent child under three years of age. The record shows that Carver was married to his wife in the Fall of 1920 and that their association together as man and wife was most congenial; that both man and wife appeared to be happy and contented; that the attitude of Carver toward his wife and children was kind and considerate.

In fact, the record shows that Carver was a good provider and that he was a loving and devoted husband and an indulgent father. So far as the record shows, there was never any unpleasantness between Carver and his wife. This evidence must be given full weight because it comes from the uncles, aunts, mother and brother of the dead woman. The record shows that all of Mrs. Carver's people believed him to be innocent and incapable of having committed this atrocious crime. The fact that the jury recommended him to mercy is evidence that they were not entirely satisfied that he committed the crime.

Carver's story was that the negro, Ben Whitehead, was working around the house; that after the noon day meal he gave the negro some directions about some chores to be performed and he then went across the hall and lay down on a bed to take his customary afternoon nap; that his wife and little boy were in another room on the opposite side of the hall; that he was awakened by screams from his wife; that he immediately sprang up and went across the hall and saw his wife and baby on the floor and a negro standing over them with a weapon of some kind in his hand; that he turned and ran back to his room, got his pistol, returned and saw the negro at about the door of the room in which his wife and child were; that he shot four times at the negro. The negro fell. Carver went back to his room, put two more cartridges into his pistol, returned

in the hall and shot at the negro twice as he lay upon the floor.

There were two or maybe three wounds in the negro. The State contends there were only two. One was in the head about the center of the forehead; another was in the right breast. It is the contention of the State that the bullet striking the right breast went through the heart and came out under the left shoulder blade. As no autopsy was performed, it can not be certain that these two wounds, the one in the right breast and the one under the left shoulder were from the same bullet. That, however, is immaterial.

Carver states that after he shot the negro on the floor and knew he was dead, he went into the room where his wife and child were lying; that he tried to raise his wife up, was convinced that she was dying; that he wet a towel and put it on the little boy's head, then went to a telephone and called police, doctors and neighbors.

On the day of the tragedy, during the morning hours, one Louis Evers went to the Carver home and observed that Mrs. Carver appeared to be frightened. During the same morning one E. C. Alsmeyer went to the Carver home and while there Mrs. Carver had a conversation with him in regard to the negro Whitehead. The record shows the following:

"Q. All right, state the conversation, Mr. Alsmeyer.

A. Mrs. Carver was showing me some plants and flowers that were in bloom, in this lath-house which is southwest of their home—attached to the garage. And this negro was about 20 feet away from there, leaning on the hoe-handle, and watching. And she spoke: and she says: 'Look at that nigger, how he sizes me up. I am afraid of him'. And I answered, and I says, 'He is not going to do anything while I'm here'. 'He is not going to do anything or hurt you while I'm here.

Q. Now, did she say further what the negro had done?

A. And I spoke up and I says 'Why?' And she says, 'I told him yesterday that he was the laziest good-for-nothing negro I ever saw'. And I do not remember whether she said 'He went for me' or 'made for me' but my impression now is that she said "He made for me then; I am afraid of him'.

Q. Either she said 'he made for me' or 'he went for me'?

A. Yes sir.

BY MR. BURTON:

Q. Mr. Alsmeyer, was Mr. Carver present when this conversation took place.

A. No sir.

Q. Did you inform Mr. Carver of that conversation?

A. No sir.

Q. Did Mrs. Carver inform Mr. Carver of that conversation, in your presence?

A. No sir.

Q. Now, you nor Mrs. Carver, so far as you know, informed him of that conversation?

A. No sir.

MR. BELL; You left before Mr. Carver came home didn't you Mr. Alsmeyer?

A. Yes sir.

MR. BELL: Mr. Carver was away from home?

A. Yes sir.

Q. Just what did she say to that negro?

A. She said, 'I told him yesterday that he was the laziest good-for-nothing negro I - - nigger I ever saw'.

Q. Yes; then what did she say?

A. 'He made for me' or 'went for me'; I do not remember just the words.

Q. Then what did she say?

A. I said 'Well, he is not going to do anything of that kind while I am around.' "

I have gone over the transcript of the record, in-cluding the bill of exceptions which includes the evidence, very carefully and have found no fact proven which is not just as consistent with Carver's innocence as it is with his guilt. The State has laid great stress on the fact that some blood was on Carver's shirt, both on the front and back. The record shows that Carver went to his wife and tried to raise her up and tried to administer to her after the negro was killed and at that time she was able to move her hands and throw them about; that she was bleeding profusely. She continued to move her hands until after some other people arrived upon the scene. I find no suspicious circumstances in the fact that his shirt had blood on it. The great wonder is that there was not more blood than was there if he bent over her, as he stated he did, and tried to minister to her suffering when she was in the throes of death. Every fact which was proven, or which the evidence of the State tended to prove could be absolutely true and at the same time be entirely consistent with the story told by Carver as to how the homicide occurred. It is not contended that Carver was mentally deranged and yet it is contended that he killed the negro Whitehead before killing his wife and child without provocation or excuse; that he killed his wife with a different weapon from that used to kill the negro by beating her over the head with a hatchet in a most brutal and inhuman manner and it is insinuated that he committed this murder in the hope of collecting a Ten Thousand ($10,-000) Dollar insurance policy. It is not shown that he was in any great need of money. It is further contended that he then, without any motive, provocation or excuse, killed his little boy, his only son to whom he was thor-

oughly devoted and was not old enough to be a witness for or against him.

This Court has repeatedly held that "Circumstantial evidence may be relied upon to establish guilt; but the value of this evidence consists in the conclusive nature and tendency of the circumstances relied upon; they must not only be consistent with guilt but must be inconsistent with innocence; that the facts established a strong probability of guilt is not sufficient." Whetstone vs. State, 31 Fla. 240, 12 Sou. 661; Kennedy vs. State, 31 Fla. 428, 12 Sou. 858; Jenkins et al, vs. State, 35 Fla. 737, 18 Sou. 182; Davis et al vs. State, 69 Fla. 401, 68 Sou. 460; Pate et al. vs. State, 72 Fla. 97, 72 Sou. 517, Sovereign Camp of W.O.W. vs. Hodges, 72 Fla. 467, 73 Sou. 347; Gustine vs. State, 86 Fla. 24, 97 Sou. 207; Hall vs. State, 90 Fla. 719, 107 Sou. 246; Cannon vs. State, 91 Fla. 214, 107 Sou. 360.

I think that the evidence in this case not only fails to meet the above stated rule but that many of the facts relied upon by the State to establish the guilt of Carver are inconsistent with his guilt. It appears to me that when the entire record is considered facts are thereby established which make it apparent that there is a greater probability that Ruth Carver was killed with an old hatchet wrapped up in a sock by the negro Ben Whitehead who died with some of her beads and other jewelry protruding from his pocket than that she was killed by him who had for ten years been her devoted husband and provider and the father of her children.

For the reasons stated, I think the judgment should be reversed.

HUTCHISON, Circuit Judge:

The evidence in this case plainly discloses that a most

horrible and revolting crime was committed, in the murder of the wife and child of the defendant, and raises, from all the circumstances proven, a strong probability that the defendant killed them and also killed a negro servant, and planted some worthless jewelry in the negro's pocket in an attempt to charge the murder of defendant's wife and child to the deceased negro.

In reaching a verdict of guilty, from the circumstantial evidence adduced at the trial, the jury doubtless reasoned that the average Southern negro often purloins his master's chattels but seldom robs or assaults his master, or members of his master's household. The jury was doubtless also influenced by the fact that the evidence presents a stronger probability that the defendant killed his wife and child, than that the negro did it. But this is not the rule by which one must be convicted of crime. The rule seems to be well settled in this State that when circumstantial evidence is relied on for conviction the circumstances when taken together must be of a conclusive nature and tendency, leading on the whole, to a reasonable and moral certainty that the accused and no one else committed the crime. It is not sufficient that the facts create a strong probability of and be consistent with guilt. They must also be inconsistent with innocence. Whetston v. State, 31 Fla. 240, 12 So. 661; Kennedy v. State, 31 Fla. 428, 12 So. 858; Gantling v. State, 40 Fla. 237, 23 So. 857; Jenkins v. State, 35 Fla. 737, 18 So. 182; Pate v. State, 72 Fla. 97, 72 So. 517; Hall v. State, 90 Fla. 719; 107 So. 246; Cannon v. State, 91 Fla. 214, 107 So. 360; 1 Whar. Cr. Ev. (3rd ed.) 22; Underhill's Cr. Ev. (3rd ed.) 16.

The circumstances proven in this case, to my mind, create a strong probability of and are consistent with

the conclusion that the husband and father was a fiend and brutally murdered three innocent people, but are not inconsistent with the conclusion that the defendant is innocent and that the negro suddenly became a wild maniac and murdered the wife and child of the defendant, unless it be presumed that the negro was rational and that the defendant was not. I do not think the circumstances proven measure up to the rule required to sustain a conviction, and therefore concur in the conclusions reached by Chief Justice Buford in the opinion prepared by him.

---

## ON REHEARING.

Opinion filed September 14, 1931.

PER CURIAM.—In this case the judgment of the trial court was affirmed by a divided Court at the last term. A petition for rehearing was filed and granted. Upon the rehearing the cause was fully argued by counsel for the respective parties. Three of the members of the Court are now of the opinion that the judgment of the court below should be reversed and the cause remanded for a new trial. Two members of the Court are of opinion that said judgment should be affirmed.

Because of sickness, Mr. Justice ELLIS was unable to be present and hear the argument of the cause pursuant to the rehearing granted. For that reason Mr. Justice ELLIS feels that it would be more seemly for him not to participate in the final disposition of the case.

It is therefore considered, ordered and adjudged by the Court that the judgment of the court below in this case should be, and the same is hereby, reversed, and the cause remanded for a new trial.

BUFORD, C.J., AND WHITFIELD, ELLIS, TERRELL AND BROWN, J.J., AND HUTCHISON, Circuit Judge, concur.

1432.

DAVIS, J., disqualified.

BROWN, J.—Upon a reconsideration of this case, on re-hearing and reargument, I have reached the conclusion contrary to my original opinion, that the judgment of conviction should be reversed and the plaintiff in error granted a new trial, and that the original judgment of affirmance rendered by this Court, in which the writer concurred, should therefore be vacated and a reversal granted instead.

The question presented is a very close and difficult one, involving a careful analysis of voluminous evidence, and I do not think any practical benefit would accrue from my writing an opinion thereon. Suffice it to say, that upon a careful reconsideration of the case, I am not en-tirely satisfied that the evidence on the trial was suf-ficient to exclude every reasonable hypothesis except that of the guilt of the defendant. The evidence, being cir-cumstantial, must of course not only be consistent with the guilt of the defendant, but it must be inconsistent with any reasonable theory of his innocence. Parish v. State, 98 Fla. 877, 124 So. 444, and cases cited. Applying this well settled principle to the facts and circumstances shown by the evidence in this case, I believe the judgment should be reversed and the cause remanded for a new trial.

---

## ON PETITION FOR SECOND REHEARING.

### Opinion filed October 9, 1931.

When counsel appear at the bar of the court to present an argument to the court sitting En Banc and, without objection, present their argument to a majority of the Court so sitting when an-other member, or members, of the Court are absent because of sickness or disqualification, it will be expected that the Court will dispose of the case as is contemplated by the provision of Section 4, Article V of the Constitution.

Petition denied.

A writ of error to the Circuit Court for Highlands County; W. J. Barker, Judge.

Cary D. Landis, Attorney General for the petition for rehearing.

PER CURIAM.—The judgment of the Circuit Court was reversed by order of this Court filed September 14th, 1931. Prior to that date, to-wit; on the 24th day of April, 1931, an order concurred in by four Justices of this Court was made affirming the judgment of the Circuit Court. Thereafter, upon petition of the defendant, a re-hearing was granted and the cause came on to be orally argued before this Court on the 19th day of June, 1931. The Court, being then advised that Mr. Justice Davis was disqualified to participate in the hearing and determination of this cause, had invited, and procured the attendance of, the Honorable Ira A. Hutchison, Circuit Judge, to participate in the hearing and disposition of the cause in lieu of Mr. Justice Davis, disqualified.

When the hour arrived for the hearing of oral argument it was learned that Mr. Justice Ellis was sick and by reason thereof was precluded from participating in the hearing of the oral argument and further disposition of the cause. On the re-hearing the State was represented by Judge H. E. Carter, Assistant Attorney General, and the Honorable Grady Burton, State Attorney for the Nineteenth Judicial Circuit of Florida, who prosecuted the plaintiff in error in the lower court. The plaintiff in error was represented by Honorable W. D. Bell of Arcadia and Judge Will H. Price of Miami. The Chief Justice announced to the attorneys representing the parties at the bar of the Court: "We are sorry to learn this morning that Mr. Justice Ellis is ill and unable to participate in this hearing. Without

objection, the cause will proceed for hearing and disposition before the Court of five Justices present.'' There was no objection and counsel proceeded to submit their cause to a quorum of the Supreme Court of Florida, such quorum consisting of four Justices of the Supreme Court and Honorable Ira A. Hutchison, Circuit Judge officiating in lieu of Mr. Justice Davis, disqualified.

Section 4, Article V of the Constitution of Florida provides in part as follows:

"The majority of the Justices of the Supreme Court shall constitute a quorum for the transaction of all business. But when there shall be six Justices of the Supreme Court, the Court may hear and determine cases and exercise any of its powers when sitting either in a body or in two divisions, under such regulations as may be prescribed by law or by the rules of said Court not inconsistent therewith. The concurrence of a majority of the members of the Court sitting in any cause wherein the Court shall sit as one body shall be necessary to a decision'';

When counsel for the State and for the defendant below, plaintiff in error here, submitted their argument on rehearing to a Court of five members without protest or objection, they have no right to complain of the absence of the other member of the Court or of his non-participation in the disposition of the cause.

It is manifestly unfair to the Court for counsel to demand a second re-hearing simply because a majority of the Court of five members participating in a former re-hearing has disposed of the case with a result unsatisfactory to counsel applying for such second re-hearing.

It would be manifestly unfair to the Court and especially to the member of the Court not participating in the hearing of an oral argument of a case where a re-hearing has been

granted because the Court was not satisfied to stand upon its original judgment in the premises to demand or expect that member of the Court who had not participated in the hearing of the oral argument and who had not had the benefit of such argument, to come in and nevertheless participate in the disposition of the cause.

When counsel appear at the bar of the Court to present an argument to the Court sitting En Banc, without objection, present their argument to a majority of the Court so sitting when another member, or other members, of the Court are absent because of sickness or disqualification, it will be expected that the Court will dispose of the case as is contemplated by the provisions of the Constitution above quoted.

On the former re-hearing Mr. Chief Justice Buford and Mr. Circuit Judge Hutchison adhered to the original dissenting opinion prepared by Mr. Chief Justice Buford and Mr. Justice Brown filed a written memorandum of his reason for concurring with Mr. Chief Justice Buford and Mr. Circuit Judge Hutchison in the judgment of reversal. Therefore, the majority of the Court of five concurred in a judgment of reversal because it appeared that the evidence failed to comply with the rule of law that, ''where circumstantial evidence is relied upon for a conviction such evidence must not only be consistent 'with the guilt of the defendant, but it must be inconsistent with any reasonable theory of his innocence.'' Parish vs. State, 98 Fla. 878, 124 Sou. 444, and cases there cited.

The petition for a second rehearing is denied.

BUFORD, C.J., AND WHITFIELD, TERRELL AND BROWN, J.J., AND HUTCHISON, Circuit Judge, concur.

ELLIS, J., not participating.

DAVIS, J., disqualified.

ELLIS, J.—I think I should not participate in the application by the State for a rehearing in this cause, because being precluded by my absence on account of physical ailments and under medical treatment from hearing the oral argument oh the rehearing I deemed it proper not to participate in the reconsideration of the case and the opinion filed September 14, 1931. To have participated then would have been practically to deny to the accused whatever of benefit may have accrued to him by reason of the oral argument. To have denied him that right would not have been consistent with judicial conduct in my judgment. That the reargument in behalf of the accused was persuasive of the legal insufficiency of the evidence to warrant a conviction was evidenced by the fact that one of the Justices, Mr. Justice Brown, who on the first hearing was for affirmance was convinced that the judgment should be reversed. It is illogical therefore to assume that I would have been unmoved by the argument on rehearing.

The rule in relation to circumstantial evidence is correctly stated in the Parish case, *supra,* that to warrant a conviction the circumstantial evidence when relied upon "must be of a conclusive nature and tendency, leading on the whole to a reasonable and moral certainty that the accused and no one else committed the offense. It is not sufficient that the facts create a strong probability of and be consistent with guilt; they must be inconsistent with innocence."

The inconsistency with the theory of innocence must appear from the circumstances in evidence, and not be the result of hypotheses having no foundation in the record, and the rule does not require that the circumstances in evidence be clearly inconsistent with innocence before a conviction is justified.